DUKE POWER COMPANY, A CORPORATION OF NEW JER-SEY, PLAINTIFF-APPELLANT, v. EDWARD J. PATTEN, SECRETARY OF STATE OF NEW JERSEY, AND ARCHI-BALD S. ALEXANDER, TREASURER OF THE STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS.

Argued October 31, 1955—Decided November 21, 1955.

*Mr. Thomas McNulty* argued the cause for the appellant (*Messrs. Milton, McNulty & Augelli*, attorneys).

*Mr. Harold Kolovsky,* Assistant Attorney-General, argued the cause for the respondents (*Mr. Grover C. Richman, Jr.,* Attorney-General; *Mr. Thomas L. Franklin,* of counsel).

The opinion of the court was delivered by

VANDERBILT, C. J. The plaintiff appeals from a dismissal of its complaint by the Law Division of the Superior Court. It is being considered by this court as the result of a certification on our own motion.

The action was brought for declaratory relief under *N. J. S.* 2A:16–51 *et seq.* seeking to have it determined that a filing fee charged the plaintiff under the statutes relating to the fees to be paid the Secretary of State by corporations on the filing of certificates of incorporation and amendments thereto (*R. S.* 14:16–1 *et seq.*) was excessive by the sum of $15,000.

The plaintiff was incorporated on May 1, 1917. Its certificate of incorporation authorized the issuance of $7,500,000

worth of capital stock to be divided into 75,000 shares of the par value of $100 each. On the filing of this certificate it paid to the Secretary of State a filing fee of $1,500. Subsequent to the original incorporation and up to October 30, 1942 the plaintiff filed several amendments to its certificate of incorporation increasing its capital to $150,000,000. The total fees paid for such privileges was $30,000. Then on October 30, 1942 the plaintiff's charter was amended by action of its stockholders to provide that its authorized capital stock should be 1,500,000 shares of no par stock in place of the previously authorized 1,500,000 shares of the par value of $100 each. The fee for such certificate calculated at the rate provided for in *R. S.* 14:16–2 amounted to $15,000. But no fee was charged by the Secretary of State for the filing of this certificate because the statute provided that in the event of such a change from par value to no par value stock "the secretary of state shall allow the corporation credit for the fees previously paid pursuant to law upon the authorization of the shares so changed and upon any prior change of such shares, before exacting the fee herein prescribed. * * *" Since the plaintiff had, up to this time, paid fees totalling $30,000, the credit provision in the statute absolved it from any further fee payment for the filing of this certificate.

On October 15, 1952 the plaintiff filed with the Secretary of State a further amendment to its certificate of incorporation which increased its then authorized 1,500,000 no par shares to 5,000,000 no par shares. The statutory fee required by such transaction, calculated at the rate provided for of one cent per share (*R. S.* 14:16–2) for the shares thereby created, amounted to $35,000.. This was the fee assessed by the Secretary of State and paid by the plaintiff. The plaintiff now claims that since the required fee for the filing of the certificate of amendment of October 30, 1942 used up only $15,000 of the $30,000 credit resulting by reason of fees previously paid by it to the Secretary of State, it was entitled to have that excess of $15,000 applied toward the fee required for the filing of the certificate of amendment

of October 15, 1952 and, therefore, the fee exacted on such date should have been only $20,000 instead of $35,000.

The plaintiff filed this suit on December 1, 1954, more than two years after the payment of the fee by it, alleging the facts set forth above and that "$15,000 in excess of the fees prescribed by law" have been paid over by the Secretary of State "to the state treasurer who, in turn, has credited the said $15,000 to the state treasury"; that as a result of these facts "$15,000 of the plaintiff's money was credited to the state treasury which did not represent State revenues"; that every year since 1952 the Legislature has appropriated all monies not constituting state revenues which were credited to the State Treasury to the payments of refunds to the parties entitled thereto and that as a result the defendants are authorized and obligated to refund and pay to the plaintiff such $15,000. The complaint demands judgment to the effect that:

"(a) That this court adjudicate and declare that the predecessor of the defendant secretary of state has exacted of plaintiff $15,000 in excess of the fees prescribed by law;

(b) That this court adjudicate and declare that the said $15,000 has been credited to the state treasury and does not represent State revenues; and

(c) That this court adjudicate and declare that the defendants or one of them are authorized and obligated to refund and pay over to plaintiff the said $15,000 unlawfully exacted of plaintiff, out of the treasury of the State of New Jersey."

On the defendant's motion to dismiss the complaint for lack of jurisdiction over the subject matter of the action, for its failure to state a claim upon which relief could be granted and on the ground that the suit was one against the sovereign state to which it had not consented, the trial court granted the relief sought and entered a judgment of dismissal from which the plaintiff now appeals.

Contrary to the usual practice of this court of disposing of jurisdictional matters before turning to the issues involved in the merits, and particularly because the resolution of the substantive issue is so clearly dictated by the statute here involved, we dispose of the meritorious point at the outset.

The statute in question (*R. S.* 14:16–2) dealing with the allowance of a credit for fees previously paid provides as follows:

"When any certificate of incorporation or change thereof in any of the matters specified in section 14:16–1 of this title shall involve the issuing of capital stock without nominal or par value, the fee to be paid to the secretary of state for filing such certificate shall be one cent on each share of such stock, instead of at the rates provided in said section 14:16–1, in addition to any fees which may be paid for capital stock authorized having a par value, but in no case shall such fees be less than the minimum amounts prescribed in said section 14:16–1.

*The fee payable for filing an amended certificate* of incorporation, *which changes all or a part of the shares* of authorized capital stock *from par value shares to shares without nominal* or par value or from shares without nominal or par value to par value shares, shall be at the rate of one cent per share for the shares without nominal or par value so created, or at the rate of twenty cents for each one thousand dollars par value of the par value shares so created, as the case may be, and the secretary of state shall *allow the corporation credit for the fees previously paid pursuant to law upon the authorization of the shares so changed* and upon any prior change of such shares, before exacting the fee herein prescribed, but in no case less than twenty dollars." (Emphasis supplied)

■■ The statute speaks of a credit only in terms of a charge to be made *on a change* from par to no-par or *vice versa*. The second paragraph can have no other meaning than limiting its application and the credit to amending certificates which seek to change the class of stock. The plaintiff would have it apply to certificates increasing the number of authorized shares, but there is absolutely no possible basis for such interpretation. The provision equitably recognizes that a corporation might in the course of its existence change its class of authorized stock and in so doing ought not to be required to pay any additional fee other than the minimum of $20 if the fee on the shares so changed does not equal the fees already paid by it on the total shares authorized (which was the case here in October, 1942), or ought not to be required to pay any more than the difference between the total required by the new change in class and that already paid on the total shares authorized but in no event less than

the $20 minimum. There is no indication in the statute that the Legislature intended the Secretary of State to maintain a running or open account where credits and debits were to be made on every change on the capital structure. If that had been intended, it could have been easily provided for. Where the wording of a statute is clear and explicit we are not permitted to indulge in any interpretation other than that called for by the express words set forth, *Zietko v. New Jersey Manufacturers Casualty Ins. Co.*, 132 *N. J. L.* 206, 211 (*E. & A.* 1944); *Bass v. Allen Home Improvement Co.*, 8 *N. J.* 219, 226 (1951); *Sperry & Hutchinson Co. v. Margetts*, 15 *N. J.* 203, 209 (1954); 2 *Sutherland, Statutes and Statutory Construction* (*3rd ed.* 1943), *section* 4502.

The action of the then Secretary of State on October 15, 1952, in charging the plaintiff a fee of $35,000 upon the filing of a certificate of amendment to its certificate of incorporation increasing the number of its authorized shares of no-par stock was therefore entirely proper.

Turning now to the jurisdictional issues in the case, we find the main point of contention to be one concerning the immunity of the sovereign State of New Jersey from suit in its courts without its consent. It is the plaintiff's position that this doctrine does not prevent the maintenance of this action because it is strictly not a suit against the State but rather an action seeking a declaration of the meaning of a statute and the adjudication of its rights, status or other legal relations thereunder within the meaning of the rule set forth in *Abelson's Inc. v. New Jersey State Board of Optometrists*, 5 *N. J.* 412 (1950); that this is an action to confine a state official, as opposed to the sovereign itself, to his legal limits and therefore not one from which the State is immune. The plaintiff further claims that its action should be permitted because the problem involves the construction of an important statute and because there is no other remedy available to it except this declaratory action.

We cannot agree with the whole or any part of the plaintiff's position. Suits designed to control state action or to subject the State to any liability are within the principle

of sovereign immunity and cannot be maintained in the absence of consent, *Strobel Steel Construction Co. v. State Highway Commission*, 120 *N. J. L.* 298 (*E. & A.* 1938). And a suit against a state officer or agency is a suit against the State if in fact the judgment obtained will operate to control state action or subject it to liability, *id.*, *p.* 301. It cannot be denied here that the effect of a judgment in suit at this stage of the relationship between the plaintiff and the State would be to control state action and subject it to a liability. As was said in *Gallena v. Scott*, 11 *N. J.* 231, 237 (1953), "There is no pretense that the individual defendants are for some reason under a personal liability * * *. The State is the substantial party in interest. The action seeks payment of the claim from the State's treasury." As Mr. Justice Reed, speaking for the United States Supreme Court in *Ford Motor Co. v. Department of Treasury of State of Indiana*, 323 *U. S.* 459, 65 *S. Ct.* 347, 89 *L. Ed.* 389 (1943), where the plaintiff was attempting to obtain a refund of taxes illegally exacted, aptly said, 323 *U. S.* at *page* 464, 65 *S. Ct.* at *page* 350:

"When the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants."

But if under the laws and in fact the state officers were required to pay over the money to the plaintiff they could not shield themselves behind the doctrine of sovereign immunity for this doctrine will not prevent a suit in lieu of prerogative writ to compel a state officer to legally perform an act required of him.

 In this latter regard the plaintiff urges that because the construction of the statute here involved is not settled, an action in lieu of *mandamus* will not lie. This amounts to an attempt to cover the failure on its part, with knowledge or otherwise, to seek its remedy in October 1952 when the issue arose, so as to avoid the effect of the naturally provoked reply by the defendants that this suit for declaratory judg-

ment will not lie when there is another clear remedy, *United States Fidelity & Guaranty Co. v. Thirion*, 123 *N. J. L.* 29 (*Sup. Ct.* 1939) ; *Empire Trust Co. v. Board of Commerce & Nav. of New Jersey*, 124 *N. J. L.* 406 (*Sup. Ct.* 1940). Moreover, pursuant to the rules of court, *R. R.* 4:88–15, *R. R.* 1:3–1, any such suit in lieu of prerogative writ has long been barred by the passage of time. But we do not understand that the lack of any judicial decisions definitely setting forth the meaning of a statute is any disabling factor in the pursuit of a proceeding in lieu of a prerogative writ. What of the myriad of statutes that are so clear and unmistakable in their meaning as to require no construction? Can it be said that any duty imposed by such statutes cannot be enforced by action in lieu of prerogative writ because their construction is not settled? The fact that someone contends for a meaning different from that clearly expressed does not make the construction of a law unsettled. If this were so, then a proceeding in lieu of *mandamus* would never lie because the defendant would merely have to claim that he believes the duty required of him was different than that sought to be compelled. Rather the rule is that a litigant may bring an action in lieu of the prerogative writ based upon the premise that he can establish that the ministerial duty to be performed by the officer is set forth in language so clear and unmistakable as to be without any doubt as to the meaning thereof. If he is correct the order will issue; if he is not it will be denied, *Cooper v. State Board*, 114 *N. J. L.* 10 (*Sup. Ct.* 1934), affirmed 115 *N. J. L.* 115 (*E. & A.* 1935) ; *High, Extraordinary Legal Remedies* 12, § 9; see also *Jersey City v. Zink*, 133 *N. J. L.* 437 (*E. & A.* 1945).

■ From all that appears the plaintiff chose to make a voluntary payment in October 1952, in order to avoid any inconvenience to itself or delay in its intended objective, hoping to convince the state officer of the merit of its position and obtain a refund. We think the proper remedy here was action in lieu of prerogative writ at the time the demand for the fee was made. And having chosen not to invoke such

52

remedy it should not now be permitted to seek relief in the guise of a declaratory judgment.

Borchard in his work on *Declaratory Judgments* (*2nd ed.* 1940), at *page* 374, with particular pertinence, says:

"A similar rule prevails in the states. The immunity of the state from suit, a much abused concept, is not altered or modified by the Declaratory Judgments Act. On several occasions an effort has been made to obtain a declaration of the state's duty to refund or pay money, which was not under the law possible, but merely to obtain an adjudication of legal rights. Its persuasive effects, to induce a legislature to make an appropriation, might be considerable. Needless to say, such a proceeding is not sustainable and a court should decline jurisdiction, even though an ostensibly suable public officer is made defendant as an *alter ego* for the state."

The appeal is dismissed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*For reversal*—None.