EVERS, J. T. C.
The subject of this appeal is the second largest horse farm (standardbred — pacers and trotters) operation in New Jersey. The property involved, formerly known as Justamere Farm, contains approximately 525 acres located in Tewksbury, Lebanon and Califon in Hunterdon County. Only the 52 acre portion in Califon (borough) is under appeal. From denials by the borough assessor of its claim for farmland assessment pursuant to N.J.S.A. 54:4-23.1 et seq. (the act) for 1974 through 1978, the taxpayer sought relief from the Hunterdon County Board of Taxation. The Board found in favor of the taxpayer in each *156 year and the borough has filed this appeal. True value is not in issue. In issue here is the treatment to be accorded to marginal — outlying lands similar to the question presented in Andover v. Kymer, 140 N.J.Super. 399, 356 A.2d 418 (App.Div.1976) and a woodland claim, based on a silviculture program[1] as was addressed in Urban Farms, Inc. v. Wayne, 159 N.J.Super. 61, 386 A.2d 1357 (App.Div.1978).
The subject lands were admittedly in farm use for many years.[2] From 1920 to approximately 1952 the lands were used as a dairy farm. From 1953, when it was purchased by one Schwartz, trading as Justamere Farms, it was used for more general farming purposes including the raising of crops and animals. In 1969 the entire tract was sold to the taxpayer who was then operating a horse farm known as the Hill Road Farm, which was approximately five miles distant. Actual possession by the taxpayer was deferred until May 1972, during which period it was assumed Schwartz would continue farming on a limited basis. From the inception of the act in 1965 through 1973[3] the favored farmland treatment was accorded to the entire premises. The contiguous lands in Tewksbury and Lebanon have qualified for farmland assessment for each year to date.
Prior to 1972 taxpayer had conducted its horse farm operation at the Hill Road tract. On taking possession of Justamere Farm in that year and after making extensive repairs to buildings and fences and preparing the lands for the growing of good quality *157 hay and grain, a portion of the operation was transferred to Justamere. To be noted is that none of the repair and soil conditioning work took place on the Califon tract. In fact taxpayer conceded that the Califon lands were never used for pasturing its animals or the growing of crops. Taxpayer nevertheless claims it is eligible for farmland assessment because the Califon lands are an integral part of the farm and serve as an essential buffer for the admitted qualified farm operations conducted in Tewksbury and Lebanon. The primary question thus presented is whether these 52 acres, which were never used by this taxpayer directly for agricultural or horticultural purposes, may nevertheless qualify for farmland assessment. The borough’s denials were based on its assessor’s conclusion that such lands were not actively devoted to agricultural or horticultural purposes as required by the act.
For land to qualify for farmland assessment the act, in its pertinent provisions, requires the following.
1. The area of the land must be no less than five acres. N.J.S.A. 54:4- 23.6(b).
2. The land must have been actively devoted to agricultural or horticultural use for at least the two successive years immediately preceding the tax year in question. N.J.S.A. 54:4-23.6(a).
The “actively devoted” criteria is deemed satisfied “... when the gross sales of agricultural or horticultural products produced thereon together with any payments received under a soil conservation program have averaged at least $500 per year during the two year period immediately preceding the tax year in issue, or there is clear evidence of anticipated yearly gross sales and such payments amounting to at least $500 within a reasonable period of time.” N.J.S.A. 54:4-23.5. A 1973 amendment provides that each acre in excess of five acres must produce $5 if devoted to agricultural-horticultural use and $.50 in the case of woodland and wetland.
Land is deemed to be in agricultural use “... when devoted to the production for sale of plants and animals useful to man, including but not limited to: ... grain and feed crops; ... horses ..., including the breeding ... of such animals; trees and forest products... . ” N.J.S.A. 54:4-23.3.
*158 Obviously the 52 acres located in Califon satisfy the area requirements of the Act. Taxpayer’s unrefuted testimony was that at any given time during each year in question it raised and bred 150 horses on the Justamere Farm and produced approximately 12,000-15,000 bales of hay and straw thereon each year. The annual gross sales of the animals and the value of the hay and straw produced thereon and consumed by the animals was never less than $111,500 and reached a high of over $400,000. Accordingly, if the subject lands are viewed as part and parcel of the Justamere Farm in the sense that the nature of the operation and the income generated from the Tewksbury and/or Lebanon portion is attributed to the Califon tract, it would appear that the requirements of the Act are satisfied.
The borough claims however that the Califon lands must stand alone and satisfy the requirements of the Act independent of the Lebanon-Tewkesbury operation. It further claims that the subject lands are capable of supporting the farming activities contemplated by the Act and are not of the marginal character so as to qualify as part of a farm as was found in Andover v. Kymer, supra. It lastly claims that the alleged silviculture program fell short of satisfying the “trees and forest products” requirement of the Act. In summary, according to the borough, the subject lands were not “actively devoted” to agricultural use. The determination of answers to these issues requires an understanding of the nature of taxpayer’s business and of the Califon lands.
The taxpayer commenced the operation of a standardbred horse[4] farm at the Hill Road tract in 1965. Due to the growing interest in the sport of harness racing, taxpayer’s operation was *159 expanded and in 1972 it took possession of the Justamere Farm. While the breeding part of the operation primarily remained at Hill Road, the boarding and raising of the horses was evenly divided between the two farms. The taxpayer stands three stallions on the farm for the accommodation of outside mares which are brought to the premises for breeding purposes. The stud fees vary from $1,500 to $2,000 per performance. The mares and foals are boarded and yearlings[5] are also raised in the six barns on the 475 acres in Tewkesbury and Lebanon. The annual sales inclusive of the yearlings and horses varied with some yearlings selling for $35,000 each and broodmares having a sales value in excess of $100,000. The boarding fees averaged approximately $250 per month per horse.
Approximately 87.5 acres of Justamere are devoted to the raising of alfalfa hay which, according to the taxpayer, produced approximately 12,000-15,000 bales with a value of approximately $30,000. The hay was not sold commercially but was fed to the animals. An additional 10,000-12,000 bales had to be purchased annually in order to feed the horses. As was the case with the animals no hay was produced on the Califon part of Justamere.
Concerning the nature of the horses, the manager of the Stonegate enterprise, who obviously possessed a broad knowledge of breeding and raising standardbreds, testified that “They’re bred for purposes of racing and consequently in our language, we call these hotblooded animals somewhat like a thoroughbred as opposed to a quarter horse who is bred for different purposes. Many of these standardbred horses are inbred and as a result of this inbreeding which is based on a lot of inbreeding as well as the fact that they have a disposition, as we call it in our business, very flighty, they are very nervous and extremely so with a suckling at their side.” Tr. 212.6-14. He stated that the farm is basically designed to grow horses *160 through their weanling and yearling years. Another component is the nursing of foals, According to the witness this period represents the most difficult stage of their development with respect to temperament.
The taxpayer’s witnesses testified that it is because of the high value and extremely tempermental nature of the horses that it is necessary to provide a buffer zone between the animals and the public. Considerable testimony was adduced concerning instances of these not too docile animals injuring curious passerby; of the horses being spooked by the public and other animals, including cows; and of injuries to the animals by the public. Further testimony detailed acts of vandalism.
It was in this posture that taxpayer purchased Justamere Farm which, according to the taxpayer, afforded it an ideal layout for its operation. Taxpayer’s witnesses said that it not only offered the necessary pasture and feed growing areas but the required privacy through a natural buffer area from the more populated sections and heavily trafficked roadways as well. The latter purpose, according to the taxpayer, was well served by the 52 acres in Califon.
The Califon tract consists of two parcels on each side of Philhower Road, a moderately travelled roadway. Lot 12 in Block 31 is south of the roadway and contains 24.10 acres. It was described as having a gentle to moderate slope away from the road. Approximately one-half of its acreage was open land which, according to the borough, had previously been hayed, with the remaining 12 acres consisting of a combination of wooded, rocky, swampy lands. On the other side of Phiihower Road is located the 27.95 acre Lot 5, Block 24 which abuts the Tewkesbury portion of Justamere. It was described as having a ridge running through its center with severe grades on its slopes. Both lots were described by the taxpayer as not being susceptible of farming in the general sense of the term and particularly with respect to the horse farm type of activity. It had a pond and stream as well as rock outcroppings and wooded areas on its slopes. According to the taxpayer the makeup of *161 these lands made it impossible to graze horses thereon or to devote them to the growth of good quality feed crops required for standardbreds.
Taxpayer, relying primarily on the testimony of a state forester, attempted to prove that a silviculutre program was in effect during the period in question. The forester stated that he visited the farm when it was owned by Schwartz and on the basis of his findings prepared a management plan which had been followed by the present owners. He stated that from time to time he made additional visits. Another plan was prepared in 1975. A harvest of some timber is planned for 1986. The forester’s plan covered the entire Justamere Farm. The taxpayer testified that from time to time third parties were permitted to remove fallen trees from the lands, presumably for use as firewood.
The testimony of the borough’s witnesses centered primarily on three points; first, since taxpayer took possession of the Califon lands there was no evidence of any farming activity; secondly, the Califon lands had been farmed by Schwartz prior to the takeover by the taxpayer; and third, the lands were still capable of being farmed.
The borough’s description of the two lots did not substantially vary from that offered by the taxpayer. However, whereas the taxpayer testified that there was no evidence of any farming activities by Schwartz immediately prior to their taking possession and further that the lands and buildings were in a terrible state of disrepair, the assessor testified that during his previous tenure he had noticed the presence of some beef cattle, pigs, chickens and horses and the growing of hay on the lands. While admitting that the premises contained severe grades, some rock outcroppings and swamps and that farm equipment use would encounter some difficulty in negotiating the land, he nevertheless was of the opinion that the majority of the land could be farmed. This opinion was supported by the testimony of an assessor from a southern New Jersey taxing district which contained approximately 600 farms.
*162 Turning to the issues presented in this matter the court initially notes that there is a presumption of correctness in favor of a county board judgment, Riverview Gardens v. North Arlington, 9 N.J. 167, 87 A.2d 425 (1952), which stands until sufficient and competent evidence is adduced to controvert the judgment below. Aetna Life Insurance Company v. Newark, 10 N.J. 99, 105, 89 A.2d 385 (1952). The presumption has no artificial probitive force once substantial evidence to the contrary has been adduced. Van Realty, Inc. v. Passaic, 117 N.J.Super. 425, 285 A.2d 52 (App.Div.1971). However it is still the burden of the appellant to prove its claim in accordance with the customary civil standard of a fair preponderance.
In addressing these issues the court further notes that they are not dissimilar to those presented in Andover v. Kymer, supra where, at 402, 356 A.2d 418, it was said:
The entire tract subject to this appeal is entitled to assessment as farmland under the statute even though only a portion thereof is actually being farmed as long as it may be said, as here, that (1) the tract basically is in fact dominantly devoted and dedicated to agricultural, and not to some other alien, principal use and (2) the statutory requirements as to area (five acres or more) and gross sales have been met_i. e., agricultural products produced thereon averaging at least $500 a year during the two-year period immediately preceding the tax year in issue (1970). The tract is thus “actively devoted” to agricultural use “for at least the 2 successive years immediately preceding” that tax year. N.J.S.A. 54:4-23.2; 54:4-23.3; 54:4-23.5; 54:4-23.7. Compare East Orange v. Livingston Tp., 102 N.J.Super. 512, 535-537 [246 A.2d 178] (Law Div.1968), aff’d. o. b. 54 N.J. 96 [253 A.2d 546] (1969).
Continuing, 140 N.J.Super. at 403, 356 A.2d 418, the court held:
Under these circumstances the special farmland tax treatment is not limited to that part of the tract shown to be used for an agricultural purpose_i. e., only the fertile or cultivated area of the farm. Woodland, wet areas and other acreage having a marginal value for agricultural or horticultural use may also be given such tax advantage, as long as it is part of, appurtenant to, or reasonably required for the purpose of maintaining, the land actually devoted to farm use, particularly where it has been part of the farm for a number of years. See N.J.S.A. 54:4-23.11; N.J.A.C. 18:15-6.2.
Here, it cannot be denied that the entire Justamere lands are used only for farming purposes. Furthermore the evidence is overwhelming that the Califon lands are the “marginal” type lands which the court in Andover, found to qualify for farmland *163 assessment. It may well be that some crops could be grown on the Califon lots. It is possible that some animals may even graze the lands. However, I find that the vast majority of the lands are not suitable for farming as that term is applied to a standardbred horse farm. In making this finding I give great weight to the testimony of taxpayer’s witnesses whose candid, clear and convincing statements lead me to conclude that the standardbreds could not be “turned out” on these lands which contain severe slopes, rock outcroppings and boulders, heavily wooded areas, swamps and marshes. I further find that the relatively small cleared areas which contain rocks and boulders, thus inhibiting the use of tractors, mowers, balers and other such farm equipment, could not support the high quality feed crops which the animals require. In this view the fact that the Califon lands were not devoted to the growing of crops or production of animals, a point readily conceded by the taxpayer, is of no consequence. For the same reason, the fact that, at some point in time, the assessor saw pigs, chickens, cattle and some horses on the lands is likewise of no importance. Although the lands may have had more than a marginal value in a previous farm use it does not necessarily follow that such non-marginal value must be attributed to all subsequent farm uses. It would appear therefore that, pursuant to the reasoning of Andover, the subject lands qualify for farmland assessment. Still to be discussed, however, are two additional points.
In Andover, the lands in question were located in one taxing district. The 525 acre Justamere Farm is located in three taxing districts with only 52 acres being in Califon. Under these circumstances the borough argues that each unit of land must satisfy the Act’s requirements in order to qualify. I disagree. Although the Farmland Assessment Act is akin to tax exemption statutes which must be strictly construed against the party claiming the exemption, Princeton University Press v. Princeton, 35 N.J. 209, 172 A.2d 420 (1961), to adopt the argument advanced by the borough would defeat the very purpose of the act.
*164 The legislature has not directly addressed this question although in adopting N.J.S.A. 54:4-23.18 it did provide that where lands are situated in more than one taxing district the minimum area requirement is satisfied if the totality of the lands is at least five acres. It logically follows that the legislature would not allow the combination of lands to satisfy the area requirements on the one hand and insist that, with respect to all other requirements, the divided parcels must stand on their own. It is inconceivable to suggest that each two and one-half acre lot located in separate taxing districts would have to produce $250 in gross income in order to satisfy the monetary requirements of the Act.
Two observations made by the court in Andover are pertinent here in disposing of this question. In affirming the grant of farmland assessment it noted that the lands were part of the farm for a number of years. Secondly in construing the Act it stated that a primary goal of the constitutional amendment authorizing its enactment was, 140 N.J.Super. at 404, 356 A.2d 418:
The primary goal was to save the family farm and to provide farmers with some economic relief by permitting farmlands to be taxed at a lower assessment as ongoing farms rather than on any other basis. But other objectives, although incidental to this principal purpose, are also significant, such as encouraging the maintenance and preservation of open space and the beauty of the countryside.
The Calif on lands were part of the Justamere Farm for many years. From the adoption of the Act the entire farm was accorded farmland assessment treatment. The three taxing district parcels were acquired by the taxpayer in one transaction. The borough’s argument is without merit. The obvious purpose of the Act and the constitutional amendment will not be subverted simply because the farm is situated in more than one taxing district.
Still remaining for consideration is taxpayer’s contention that this marginal appurtenant land is reasonably required for the purpose of maintaining the land actually devoted to farm use. In support of that argument the taxpayer presented *165 witnesses who had considerable experience and expertise in horse farm operations. The court was impressed not only with their candor, knowledge and experience but also with the facts supporting their opinions. They recounted numerous experiences and acts of vandalism on the Hill Road farm which resulted in not only damage to the real property but to the animals as well. Such vandalism resulted in spite of the presence of watchmen. Instances were documented of burned barns, picked locks, fences and chains cut deliberately and by accident, horses spooked by automobiles and injured by passerby and of horses breaking out and injuring the public.
According to the taxpayer the acquisition of the 525 acre Justamere Farm provided it with the ideal layout for its expanding operation in that it contained ample area [6], sufficient good pasture land, 87.5 acres of crop land and a 52 acre buffer area (in Califon). The witnesses emphasized that the distance between its pasture lands and Philhower Road coupled with the topographical features of Lot 5 were sufficient to keep the horses from the public and the public from the horses. That distance was also a factor in eliminating complaints concerning odor from nearby residents according to the taxpayer. In attempting to cast doubt on the credibility of taxpayer’s witnesses the borough referred to the fact that a police firing range is located on Lot 5; that the taxpayer had offered to sell a portion of the alleged buffer area and that in one area the pasture lands were located only 20 feet from a road. I am not persuaded by this testimony. The range, which was used only periodically, was located a sufficient distance from the horses so as to not scare or annoy them. The testimony concerning the offer of sale lacked sufficient detail to merit any weight. Additionally I note that the alleged offer concerned an acre or two of land adjacent to Philhower Road. Lastly, it is due to the *166 problems connected with pasture land being located close to a road that the taxpayer claims that a buffer is necessary.
A review of all the testimony leads me to conclude that given the value and temperament of these animals, the fact that many are owned by third parties, the degree of care necessary for the safety of both the public and the horses, a buffer area is not a mere convenience but an absolute necessity to the proper operation of the horse farm.
I further find however that Lot 12 cannot reasonably be included in that buffer area. It stands separate and apart from Lot 5 which is contiguous to the balance of the farm, being separated therefrom by the moderately travelled Philhower Road. The existence of the roadway would not deter the application of farmland assessment in other circumstances but where, as here, its sole use is for buffer purposes that factor cannot be overlooked. The existence of the roadway effectively creates two separate and distinct buffers, the need for which under these circumstances, is not supported by the evidence. Accordingly I find that the use of Lot 12 as a buffer zone is not reasonably required for the operation of the farm.
In arriving at these conclusions I am not unmindful of the decision in Weisenfeld v. South Brunswick, 166 N.J.Super. 90, 398 A.2d 1342 (App.Div.1979) and Bloomingdale Industrial Part v. Borough of Bloomingdale, 1 N.J.Tax 145 (1980). In Weisenfeld, the court denied farmland assessment to a parcel of land which was separately acquired from the farm, was never functionally a part thereof, was never integrated with it in any documentary manner and on which there was conducted an independent commercial operation not for the benefit of the farm or farmer. In Bioomingdale, where farmland assessment was also denied, the Tax Court found that the operation conducted on the land was essentially a service operation for other individuals rather than a production operation leading to the sale of horses. Both cases are distinguishable from the instant matter.
*167 With respect to taxpayer’s claim for classification of its lands as woodland because of the alleged silviculture program, I find that the vague testimony of the forester was insufficient to support a finding in its favor. While it is understood that, in some cases, it may take as long as 50 years for a tree to mature and that the usual activities associated with the harvesting of annual crops are unnecessary and that the income required in terms of time may be treated with more flexibility than in other cases, more than what is presented here is required to satisfy the statutory criteria. While in the case of timber operations the income requirements may not have to be satisfied annually, the statute nevertheless requires clear evidence of anticipated yearly gross sales at least equal to the minimum income requirement within a reasonable period. Such proofs do not exist here, N.J.S.A. 54:4-23.5. Compare Urban Farms v. Township of Wayne, 159 N.J.Super. 61, 386 A.2d 1357 (App.Div.1978) where, for the tax year and the two preceding years there were sales of firewood, live trees, evergreens; and where the dominant activity on the land was its dedication to a woodland management program for the commercial production of timber; and where the taxpayer had entered into a ten year contract providing for, among other activities, the selective thinning, cutting and planting of seedlings in order to develop the tree growth to its fullest potential and to provide for the reforesting of the lands.
In view of the foregoing that portion of the borough’s appeal pertaining to Block 24, Lot 5 is denied and the judgments of the county board are affirmed. That portion of the appeal dealing with Block 31, Lot 12 is granted and judgments shall be entered affirming the original assessments. The original assessment of $115,730 for 1974 and $113,400 for the remaining years was applied to the 52 acres in both lots. As applied only to the 24.10 acres in Block 31, Lot 12, the assessment for 1974 is $53,637. For 1975 through 1978 the assessment is $52,557.
The Clerk of the Tax Court is directed to enter judgments as follows.
*168 Block 31, Lot 12 Block 24, Lot 5
1974 $53,637 1974 $3,575
1975-1978 $52,557 1975-1976 $2,800
1977-1978 $5,900

 The technical branch of forestry which is concerned with the establishment and maintenance of the forest. Encyclopedia Britannica, Volume 20, page 548 (1968 Ed.).

 Otto Kunkel, a forester in the employ of the State of New Jersey, testified that the tract had been farmed in excess of 100 years.

 For 1973 the Califon lands were granted farmland assessment following a denial of the application by the assessor, by judgment of the Division of Tax Appeals, which found that the denial resulted from a procedural error by the then assessor. The present assessor, who had served in that office from 1965 to 1970, once again assumed those duties in July 1973.

 The breeding of thoroughbred horses (often referred to as pure breds) is traced to early Eighteenth Century England. The thoroughbred was fused with other breeds and types to produce a light breed with remarkable speed at the trot or pace called standardbreds because they were required to trot or pace a mile in a standard of time. The standardbred resembles the thoroughbred in that it is light and narrow, usually weighs 1,000-1,200 pounds and varies in height from 15 to I6V2 hands. Encyclopedia Britannica, Vol. 11, p. 705, 715, 1968 ed.

 An animal one year old or in the second year of his age. Webster’s Encyclopediac Dictionary of the English Language, p. 969, 1972 ed.

 Ideally, according to the taxpayer, each horse requires at least two acres of land.