ANDREW, J. T. C.
The eligibility of woodland for assessment pursuant to the provisions of the Farmland Assessment Act of 1964, N.J.S.A. 54:4-23.1 et seq. is at issue in this local property tax proceeding. Plaintiffs, Green Pond Corporation and Green Pond Mountain Corporation, New Jersey corporations, are the owners of a tract of land of approximately 1000 acres located in Morris County. The property is managed by plaintiffs as á private residential community. The focal point of the community is Green Pond Lake, a body of water approximately 2V¿ miles long, encompassing slightly more than 500 acres, 391 of which fall within plaintiffs.’ property. The remainder of the tract consists of homesites and recreational facilities, and 555 acres of undeveloped woodland. Situated in Jefferson Township are 169.17 acres of woodland. The lake area, the homesites, and the remaining woodland are located in Rockaway Township. The woodland ácreage is the subject of this appeal.
The stockholders of the two corporations consist of all the individuals who reside in the Green Pond community. Residence is available only to stockholders and all new stockholders must be approved by the Board of Directors (The members of the Board of Directors of both corporations are the same). The residential areas of the tract are divided into lots of various sizes which are either owned outright by their occupants or leased to them by the corporations for 99-year terms. Roughly 255 of a total of approximately 380 residential units are leaseholds. The sale of a lot or conveyance of a leasehold must receive prior approval from the Board of Directors. The woodlands are. not *279 available for sale or lease to members of the corporations but are held in fee by one or the other of the corporations.
Although not demonstrated in the record, the briefs filed by the parties without contradiction indicate that the property is served by paved roads, electrical and telephone service, and police and fire protection. Water is provided by private wells. Sewage is treated by on-site septic systems. Numerous amenities are located on the property including a recreational hall, tennis courts, yacht club, swimming areas and athletic fields. Several township roads run through the property as well as interior, private roads maintained by the corporations.
The 555 acres of woodland, for which farmland assessment treatment is sought by plaintiffs, are not all contiguous.[1] There are 156.97 contiguous acres to the south of Green Pond Lake, bordering the homesites that front the lake on its southerly shore. This parcel is of a fairly regular shape. It is entirely in Rockaway Township. The remaining woodland acres are contiguous but together comprise a highly irregular shape. They stretch around the eastern and northern shores of the lake, at one point ranging almost two miles from the lake’s eastern shore where most of the homesites are clustered. One woodland section of 45.9 acres on the lake’s northern shore connects to the remaining acreage by virtue of a thin strip of woodland approximately three-quarters of a mile long and on average only 75 feet wide. This second section is partly in each of the defendant townships.
*280 Portions of three roads traverse sections of the woodland area, serving as the means of ingress and egress for most of the Green Pond residences. Some of the homes on the south shore of the lake connect to one of these roads by means of driveways that enter into the woodland area. In this same area the septic treatment facilities of a few of the homes are located in the woodland section. Apart from these encroachments the woodland is entirely undeveloped.
The Green Pond stockholders have unrestricted access to the woodland property. Their principal use of the area is for recreation where such activities as hiking, snowmobiling, and picnicking take place. They are also permitted to cut dead trees for use as firewood without cost.
The woodland property was acquired by the plaintiff corporations in the late 1960’s. Timely applications were filed with the assessors of Jefferson Township and Rockaway Township requesting farmland assessment for all 555 acres of woodland for the tax years 1975, 1977 and 1978. No application was submitted for 1976. The assessors for both townships denied the applications for each of the tax years. The denials were appealed to the Morris County Board of Taxation which affirmed the assessments. Appeals of the county board decisions were taken to the Division of Tax Appeals and those appeals are now in this court pursuant to N.J.S.A. 2A:3A-26.
The Farmland Assessment Act provides for the assessment of real property at the value it has for agricultural or horticultural use if (a) it has been actively devoted to such use for at least the two successive years immediately preceding the tax year for which valuation under the Act is requested; (b) the area of the land is not less than five acres; and (c) application is made by' August 1 of the pre-tax year. N.J.S.A. 54:4-23.6. Land deemed in agricultural use includes land “devoted to the production for sale of plants and animals useful to man, including but not limited to: ... trees and forest products ... N.J.S.A. 54:4- *281 23.3. Land is deemed actively devoted to agricultural or horticultural use
when the gross sales of agricultural or horticultural products produced thereon together with any payments received under a soil conservation program have averaged at least $500.00 per year during the 2-year period immediately preceding the tax year in issue, or there is clear evidence of anticipated yearly gross sales and such payments amounting to at least $500.00 within a reasonable period of time.
In addition, where the land is more than five acres in area, it shall be deemed to be actively devoted to agricultural or horticultural use when the gross sales of agricultural or horticultural products produced on the area above five acres together with any payments received under a soil conservation program have averaged at least $5.00 per acre per year during the 2-year period immediately preceding the tax year in issue, or there is clear evidence of anticipated yearly gross sales and such payments amounting to an average of at least $5.00 per year within a reasonable period of time; except in the case of woodland and wetland, where the minimum requirement shall be an average of $0.50 per acre on the area above five acres. NJ.S.A. 54:4 -23.5.
Plaintiffs may satisfy the income requirements of the statute in either of two ways: by establishing annual gross sales averaging at least $775 ($500 for the first five acres plus $.50 X 550 additional acres) for the two years preceding each of the tax years in question; or with clear evidence of anticipated yearly gross sales of at least $775 within a reasonable period of time following each tax year.
Plaintiffs’ principal witnesses were Walter Jurgenson and Stanley Mesavage. Jurgenson is a stockholder and resident of Green Pond, and since October, 1978 has been general manager of both corporations. Mesavage is a retired consultant forester who was qualified as an expert in the area of forestry. Mesavage was president of Eastern Forestry Service, Inc. (Eastern Forestry) during the years in question, and on April 23,1975 that corporation and the plaintiff corporations executed a forest management agreement covering plaintiffs’ woodlands. During the course of their testimony it was established that plaintiffs *282 earned income from the sale of forest products during the years 1973 to 1977 from two sources: in 1973 and 1974 plaintiffs sold firewood to Green Pond stockholders, and from 1974 through 1977 plaintiffs sold timber to Donatoni Brothers, Inc. pursuant to a December 20,1974 agreement under which Donatoni Brothers agreed to cut and remove timber from plaintiffs’ woodlands amounting to a minimum value of $2550 over a three-year period commencing with the date of the agreement. Plaintiffs also introduced a form of the United States Department of Agriculture dated October 16,1975 authorizing payment to them of $200 for a timber stand improvement program. In the 1975 farmland assessment report prepared for plaintiffs by Eastern Forestry this payment is described as a soil conservation payment. Payments under a soil conservation program, along with sales of agricultural products produced on the land, are, as previously stated, the two sources of income that may satisfy the statute’s income requirements. N.J.S.A. 54:4-23.5. The characterization of the authorized payment in the report as a soil conservation payment was not disputed at the trial even though it was attributed to a timber stand improvement program at the trial. The record does not reveal, however, when, if ever, the payment was actually made. The Department of Agriculture form does not indicate whether the work requisite to secure payment had been performed. The 1977 farmland assessment report prepared by Eastern Forestry indicated that $200 payments were made in 1975 and 1977, but that portion of the report was stricken prior to its admission into evidence by agreement of the parties. The Department of Agriculture form was signed on February 12,1977 by the then general manager of the plaintiff corporations applying for payment (even though it did not indicate the extent of the performance necessary to obtain payment). I can only assume that this payment if it was ever made was made sometime after February 12, 1977, therefore, I find I must ignore any supposed payments to plaintiffs pursuant to a soil conservation program.
*283 Plaintiffs thus established income as follows:
1973 1974 1975 1976 1977
Firewood sales to stockholders $780[2] 292.50
Payments from Donatoni Brothers, Inc. 850 $880 $780 $699.25
Total $780 $1,142.50 $880 $780 $699.25
The testimony established that the payments from Donatoni Brothers were received by plaintiffs in the years indicated. Green Pond ledger sheets introduced in evidence show credits to the account of Donatoni Brothers in the above amounts in the respective years, and uncontradicted testimony by Jurgenson established that ledger sheet credits indicated amounts received by plaintiffs. The firewood sales, however, were proved by invoices which indicated billings only, not receipt of payment. That is important as to the tax year 1975 if the gross sales requirement of the statute does, indeed, require actual receipt of payment in the two pre-assessment years. That question need not be decided, however, in this instance. If the firewood payments were received in the years of sale then a yearly average of $961.25 is made out for the two years preceding the tax year 1975, satisfying the statute. If all firewood payments were received in 1974 the same average is established. If insufficient payments were made prior to 1975 to average at least $775 per year, the remaining amounts due plus the amounts anticipated from Donatoni Brothers would satisfy the statute under the “reasonably anticipated income” test for 1975. Therefore, plaintiffs have satisfied the statutory income requirements for the tax year 1975.
The income figures also show that the $775 two-year average is satisfied for the tax year 1977 ($830 average), but not for 1978 ($739.63 average). If 1978 is to qualify, anticipated income of at least $775 a year within a reasonable period of time following 1978 must be shown. The only testimony offered *284 regarding anticipated income came from Mesavage. As part of the forestry management agreement between plaintiffs and Eastern Forestry, he prepared forest management reports and farmland assessment reports. The management reports contained detailed information on the number of trees in various sections of the woodland, their size, species, rate of growth, and other geographical and topographical information. The farmland assessment reports, prepared in 1975 and 1977, containing information relative to qualification for farmland treatment, summarized the information in the management reports and included a summary of timber harvesting and timber stand improvement work. These reports indicated the stumpage value of plaintiffs’ timber and its anticipated growth. Stumpage value, according to Mesavage, is the value of standing timber before the trees are cut, based on the current prices paid for a particular type of tree at a particular time and place. In 1975 a total stumpage value of $21,685.50[3] was attributed to the woodland. The 1977 report does not contain a stumpage value for that year. Anticipated annual growth was valued at $1,488.67 in 1975 and $3,234.75 in 1977.
This evidence, although demonstrating the potential for yearly income from the sale of forest products in excess of $775, is not directed toward the likelihood of sales within a reasonable time. The statute makes it incumbent upon the taxpayer to present clear evidence of anticipated yearly gross sales of at least $775. This is not established by the fact that the timber, if sold, would bring in the requisite amount. Plaintiffs did not offer sufficient evidence of anticipated sales. The anticipated $200 payment from the United States Department of Agriculture is insufficient to satisfy the statute. The agreement with Donatoni Brothers, Inc. by its terms would expire December 20, 1977 unless renewed. No evidence was offered regarding any such renewal or any plans to that effect. The only evidence *285 regarding sales occurring after 1978 (no sales occurred during 1978) was offered by Mesavage who testified to two sales to Olster Landscaping Corporation in 1979. He did not indicate the dollar amounts of those sales. Nothing else was offered regarding sales anticipated to occur within a reasonable period of time following the tax year 1978.
It is true that a “reasonable period of time” can be many years when woodland is concerned. The development of a timber crop from seedlings to mature trees ready for cutting can take many years, and a plot of five acres planted with timber seedlings may qualify for farmland assessment even though sales of timber will not occur for many years. That reasoning, however, cannot rescue plaintiffs under the circumstances of this case. No testimony was presented regarding the age of the trees (57,092 of them in 1975) or their readiness for harvest. The farmland assessment reports are not sufficiently clear on this point to provide any guidance. In addition, there was no evidence of any recent plantings that would require many years to mature. It is known that trees were harvested in each year from 1973 to 1977. There is nothing indicting that all the mature trees were harvested by 1977 nor was there an indication that harvesting of mature trees could not continue while other trees matured. In short, nothing in the record indicates anticipated sales within a reasonable time for this particular woodland. Clear evidence of that fact is required to satisfy the statute. NJ.S.A. 54:4-23.5. In the absence of such evidence I cannot find that yearly sales amounting to $775 are anticipated within a reasonable period of time. Plaintiffs, therefore, have not satisfied the income requirements of the statute for the tax year 1978 and for that year their request for farmland assessment must be denied on that basis alone.
In order to qualify for farmland assessment for 1975 and 1977, having shown sufficient income, plaintiffs must also demonstrate that in those years and the two preceding years a minimum of five acres was actively devoted to agricultural use. Such a showing was not made as to 1975. Plaintiffs did not *286 establish that five acres of woodland were devoted to agricultural use in the pretax years of 1973 and 1974. The only agricultural use made of plaintiffs’ woodlands in those years resulted from the sale of firewood to Green Pond stockholders and the sale of timber to Donatoni Brothers, Inc. The management of the entire woodland by Eastern Forestry Service did not begin until April, 1975. As to the sale of firewood, no evidence was presented other than the introduction of invoices. In particular, there was nothing offered as to where from among plaintiffs’ 555 acres of woodland the firewood was harvested. I have no way of knowing whether the firewood came from an area one acre in size, five acres in size, or if it was taken from random areas throughout the woodland. The possibility even exists that it came from some part of plaintiffs’ land outside the 555 woodland acres. There was testimony by Robert Doolittle, a licensed professional engineer and land surveyor who prepared the survey of the property, that timber trees were growing outside the woodland acres that are the subject of this appeal. The same possibility exists for the harvesting done by Donatoni Brothers, Inc. in 1974 (and for later years as well). Jurgenson testified that all the timbering activity took place in one particular area of woodland, though he could not identify that area or state how large it was. Neither did Mesavage know where cuttings were made prior to 1975. It is clear, therefore, that plaintiffs did not establish that five acres of woodland were devoted to agricultural use in 1973 and 1974. Some acreage was so devoted, but the record does not indicate where or how large that acreage was, and thus I do not know if the five-acre requirement was met. Plaintiffs’ quest for farmland assessment for the tax year 1975 therefore must fail.
The situation is different as to 1977. Again, for the two years preceding that tax year, the record does not indicate where or from how large a section of woodland the harvesting took place. But from April, 1975 on, all 555 acres were the subject of a forestry management program, and it might be said that that fact together with proof of sufficient income will satisfy the statute even though five particular harvested acres are not *287 shown. This question need not be decided, however, for there are two other factors present that serve to defeat plaintiffs’ cause.
The first concerns the requirement that the five-acre showing be made for the two years preceding the tax year in question. Assuming, in this case, that the management of the woodland both satisfies the five-acres requirement and qualifies the entire acreage, it must be shown to have been in effect for the two successive years immediately preceding the tax year. Those two years are 1975 and 1976. The management program, however, did :rot begin until April 23,1975. Prior to that date a five-acre showing, as noted above, was not made. May the two-year requirement be satisfied by the one year and eight month showing made here? If that were sufficient, then a showing of one year and any part of the preceding year would also suffice. The statute does not permit such a construction. The statutory reference to a two-year period is clear and precise. A two-year period is commonly understood to mean two entire calendar years. In the absence of an explicit indication of special meaning, words in a statute are to be given their ordinary and well-understood meaning. Service Armament Co. v. Hyland, 70 N.J. 550, 556, 362 A.2d 13 (1976). Where the wording of a statute is clear and explicit a court is not permitted to indulge in any interpretation other than that called for by the express words set forth. Duke Power Co. v. Patten, 20 N.J. 42, 49, 118 A.2d 529 (1955). I find that plaintiffs must demonstrate the devotion of five acres to agricultural use for the two-year period commencing January 1, 1975, and that such a showing has not been made. Accordingly, plaintiffs are not entitled to farmland assessment for the tax year 1977.
In addition to the above, plaintiffs have failed to demonstrate compliance with the rule of law reflected in the opinion of Justice (then Judge) Handler in East Orange v. Livingston Tp., 102 N.J.Super. 512, 246 A.2d 178 (Law Div.1968), aff’d, 54 N.J. 96, 253 A.2d 546 (1969). In that case plaintiff, City of East Orange, brought an action in lieu of prerogative writs seeking a *288 judgment directing the defendants to assess 2,500 acres of property owned by East Orange, generally known as the East Orange Water Reserve, as farmland for the tax year 1968. The majority of the acreage was alleged to be permanent pasture and woodland devoted to agricultural use within the meaning of the Farmland Assessment Act because the land was used for the growing and sale of hay, timber and firewood from which East Orange derived annual income in excess of the statutory minimum. Despite the introduction of evidence detailing an active program for the management of the woodlands, and indicating sales of forest products totaling $24,989.05, $3,719.08 and $1,509.75 in the years 1965,1966 and 1967, respectively, the court concluded from all the evidence presented that
It is abundantly clear that the lands of the East Orange Water Reserve are used for the purpose for which they were originally acquired, namely “for the purpose and for the protection of a public water supply.” Any other uses of or activities upon the said properties are merely incidental to the use of the land as a watershed. Id. at 529, 246 A.2d 178.
The court ruled in favor of the defendants, basing its decision in part on the fact that special legislation existed for the taxation of lands used as a municipal watershed. See N.J.S.A. 54:4-23.3. The plaintiffs herein seek to distinguish East Orange on that basis. However, the court when on to say that even if the Farmland Assessment Act were applicable to a municipal watershed, the agricultural activities undertaken in that case would not qualify the property for taxation as farmland:
The pointed inquiry on this hypothesis is whether, by virtue of the activities relating to the sales of hay, timber and cordwood, it can be said that East Orange Water Reserve is “actively devoted” to “agricultural use” within the meaning of N.J.S.A. 54:4-23.2. Even though the agricultural use is “active” in the literal sense that East Orange has realized income in excess of $500 per annum for the past two years from the sale of timber, cordwood and hay (N.J.S.A. 54:4-23.5), compliance with this single criterion does not per se render the Water Reserve as land “devoted” to agricultural use.
All of the experts recognized that there can be multiple uses of woodlands or forests, which could include or combine the production of water, wood, recreation, education and the like. Depending upon the particular lands involved, one use tends to become dominant. The principal use of the East Orange Water Reserve is a watershed. Any commercial gain from the sale of hay, timber or wood is merely an incidental by-product of the maintenance of the Water *289 Reserve woodlands. The management of the forest, including the planting, harvest and removal of trees, is for the essential purpose of encouraging the recharge and replenishment of the underground wells. As far as the state program is concerned, the cutting plan for trees is not for the purpose of producing lumber commercially but with a view towards the primary use of lands as a watershed. Consequently, from any vantage point, the agricultural uses of the Water Reserve must be regarded as subservient to its dominant use as a public water supply. In no sense, therefore, can it be said that the East Orange Water Reserve is devoted, that is, committed, or dedicated, or set apart or appropriated, or given up wholly or chiefly to the production for sale of agricultural products of any kind within the meaning of the Farmland Assessment Act of 1964. Id. at 535-37, 246 A.2d 178.
The East Orange facts differ from those herein in that the forest management program undertaken by East Orange had a primary purpose, as determined by the court, unrelated to the production of forest products. Here the management program was directed solely toward the agricultural development of the woodland. That difference, however, cannot serve to avoid the application of the underlying principle of East Orange to this case, and that principle is that although multiple uses of a parcel of land, some agricultural and some non-agricultural, do not automatically disqualify it for farmland assessment, the agricultural use must predominate.[4] I am satisfied that such a showing was not made in this case. In reaching that decision, I am mindful of the fact that this statute, as is the case with exemption statutes, should be strictly construed against the taxpayer, for it provides benefits to the taxpayer at the expense of all the remaining taxpayers in the taxing district. Califon Borough v. Stonegate Properties, Inc., 2 N.J.Tax 153, 163 (Tax Ct. 1981).
Testimony by Jurgenson revealed two uses made of the woodland that is the subject of this appeal. On direct examination the following was said:
*290 Q. Mr. Jurgenson, how does the corporation use the land which is shown on that map as woodland?
A. We use it for the use of our residents for hiking, snowmobiling, nature hikes and that type of thing.
Q. Any other uses for the land?
A. We are timbering it too.
The testimony was explored during cross-examination by counsel for Jefferson Township:
Q. Now in response to one of Mr. Cotz’s questions for the uses of the property, I think you first stated that the property was used for recreational purposes, is that true?
A. Not recreational purposes, I said it was used for hiking, snowmobiling and—
Q. Picnicing? (sic)
A. —timber operation.
Q. Hiking, snowmobiling, to me they are recreational purposes?
A. Well, yes, but so are baseball fields and soccer fields which we don’t have on the property.
Q. Hiking, snowmobiling, picnicing (sic) came to your mind first obviously, is that correct?
A. That’s correct.
Q. And you believe those to be the primary uses of the property?
A. Along with our timber operation.
This testimony, along with the overall picture of the Green Pond Community and its management presented by all the evidence, lead to the conclusion that the dominant use of this woodland is not agricultural. The two corporations were formed in 1921 to manage a private residential lake community. Some 50 years later 555 acres of undeveloped woodland were acquired. In the years since then activities were undertaken aimed at producing sufficient agricultural income to satisfy the Farmland Assessment Act. This is particularly evident in the agreement with Donatoni Brothers, Inc., in which that corporation was committed to purchase a certain dollar value of timber just over the statutory minimum for property of this size. Although that fact of itself does not deny a bona fide agricultural use, taken together with the other use of the property it lends credence to the conclusion that the agricultural activities were planned primarily to satisfy the statute. Plaintiffs assert that the subjective intent of the owners of property regarding its use *291 is irrelevant as long as the acreage and income requirements of the statute are satisfied. That contention must give way to the extent it conflicts with the requirement of dominant agricultural use set forth in East Orange.
Jurgenson’s testimony establishes that the use of the woodland by Green Pond stockholders for various recreational activities is a primary use of the land. That fact is consistent with the nature of the entire Green Pond tract as a residential community and the existence of the plaintiff corporations to manage that community for the benefit of its residents. Such a role for the agricultural activities undertaken here does not satisfy the standard set forth in East Orange. Accordingly, plaintiffs are not entitled to farmland assessment for any of the years in question, i. e., 1975, 1977 or 1978.
To summarize, plaintiffs have failed to demonstrate entitlement to farmland assessment for any of the tax years at issue. For 1978, sufficient income was not shown to have been earned in the two pretax years or anticipated within a reasonable period of time. For 1975, although sufficient income was proved, it was not shown that five acres of land were committed to agricultural use for the pretax years of 1973 and 1974. For 1977, sufficient income was shown, but the devotion of five acres to agricultural use was not established for the two entire pre-tax years. In addition, it was not demonstrated that the dominant use of the land was agricultural as required by East Orange v. Livingston Tp., supra. This last factor applies with equal force for each of the three tax years, and it would suffice to deny farmland treatment for each of the three years even in the absence of all the additional factors previously noted.
In light of the above, the issue presented by defendant, Jefferson Township, involving the effect of Jefferson Township zoning ordinances prohibiting farmland activity on the property need not be considered.
Judgment shall be entered accordingly.

 There are a number of exhibits which were introduced in evidence by plaintiffs and are contradictory on this point. Two reports on the eligibility of the property for farmland assessment prepared for plaintiffs by Eastern Forestry Service, Inc., which has managed the woodlands since April, 1975, state that all 555 acres of woodland are contiguous. A survey mapping out plaintiffs’ entire holdings which was referred to throughout the trial indicates that the woodland is comprised of two separate noncontiguous sections as described in the body of the opinion. I find that the survey is the more credible exhibit, especially since it was utilized by counsel for all parties at the trial and its depiction of the woodland areas was not contested.

 Invoices offered in evidence indicated total sales of $830 in 1973. One $50 sale was cancelled, accounting for the $780 total.

 This amount, testified to by Mesavage, differs from the figure of $21,985.50 contained in the 1975 farmland assessment report. The difference has no effect on the outcome of this case.

 Urban Farms, Inc. v. Wayne Tp., 159 N.J.Super. 61, 386 A.2d 1357 (App. Div.1978), appears to go beyond East Orange v. Livingston Tp. and require a showing that the exclusive use of the property be agricultural. See Urban Farms, supra, at 66, 67, 386 A.2d 1357. Although plaintiffs would clearly fail an exclusivity test, resort to such a standard is unnecessary. They do not satisfy the test of predominance established in East Orange.