ANDREW, J.T.C.
This is a state tax case involving the Corporation Business Tax Act, N.J.S.A. 54:10A-1 et seq. The issue presented is whether a wholly-owned subsidiary must include indebtedness owed by it to its parent corporation as part of its net worth in computing its franchise tax liability for the tax years of 1974 and 1975 pursuant to N.J.S.A. 54:10A-4(d)(5) (hereinafter § 4(d)(5)).
The present plaintiff, Toys “R” Us, Inc. brings this action on behalf of a predecessor corporation, Toys “R” Us-NJ (Toys-NJ). The facts were stipulated. Toys-NJ, a toy supermart business, was incorporated in New Jersey in May 1970. During the disputed tax years 1974 and 1975, Toys-NJ was a wholly-owned subsidiary of Interstate, a holding company incorporated in Delaware with its principal offices in New York City. Interstate owned, nationwide, a large number of department stores and discount stores, as well as a chain of Toys “R” Us stores. From its corporate headquarters in New Jersey, Toys-NJ directly managed the Toys “R” Us retail chain of approximately 50 stores throughout the United States.
As part of its role as a holding company for all its subsidiary operations, including Toys-NJ, Interstate’s normal operating procedure was to borrow funds from outside sources for an intercompany account from which it would distribute cash ad *54 vanees to the subsidiaries as needed, and debit the subsidiary’s account accordingly. Conversely, as a subsidiary accumulated excess profits not required for ordinary business operations, it would remit these excess monies to Interstate and receive a credit on its intercompany account. Utilizing the foregoing financial structure, Toys-NJ had a balance of $15,925,137.29 owing to its parent, Interstate, at the end of its fiscal year 1974 and a balance on these loan advances totalling $19,882,144 at the end of its fiscal year 1975.
Due to overexpansion of its discount stores in the late 1960’s, Interstate incurred substantial business losses that precipitated the filing of a Chapter XI bankruptcy petition by Interstate and all of its subsidiaries on May 22, 1974. The United States District Court for the Southern District of New York (district court) ordered that the proceedings continue under a Chapter X reorganization of the Federal Bankruptcy Act. Two trustees were appointed by the district court to continue normal business operations by performing whatever duties were necessary to maintain and preserve Interstate and all of its subsidiaries as viable corporate entities until such time as a reorganization plan could be formulated and approved.
Although Interstate had made loans to Toys-NJ in plaintiff’s early years of growth, by the time the bankruptcy petition was filed by Interstate, plaintiff had become a profitable and financially self-sufficient enterprise as well as an important source of income for the parent to finance its other failing divisions. Prior to the institution of bankruptcy proceedings, on April 23, 1973, Toys-NJ and all of Interstate’s other subsidiaries guaranteed the parent company’s debt to certain banks and insurance companies, designated the “institutional creditors” during the bankruptcy proceedings. To insure that the excess cash proceeds from the successful Toys-NJ division would not be depleted or siphoned off to keep the other subsidiaries and Interstate financially solvent, the trustees in bankruptcy, at the request of these institutional creditors, obtained an order from *55 the district court on June 26, 1974 prohibiting any transfer of funds from Toys-NJ to Interstate or any of its affiliated companies with the exception of a $75,000 direct monthly payment to the parent company for administrative expenses.
Since the bankruptcy order prevented Toys-NJ from repaying Interstate’s loans through the intercompany account, Toys-NJ accumulated a large cash reserve during the four years it took to complete the reorganization of the parent holding company.[1] Under the final reorganization plan approved April 6, 1978, Toys-NJ merged with Interstate and all other subsidiaries to form a new corporate entity, Toys “R” Us, Inc., the plaintiff in this action. As part of the financial settlement, Toys-NJ and the other Toys “R” Us subsidiaries made cash distributions of over $62 million to the creditors of Interstate and its affiliated businesses between April 1978 and December 1979. The primary source of these disbursements was the excess cash that Toys-NJ had accumulated. Subsequently, pursuant to the Director’s final determination on March 24, 1982, plaintiff challenged the includability of indebtedness owed by Toys-NJ to Interstate in the net worth component of its corporation business tax. It claimed a tax refund for fiscal years 1974 and 1975 (based on net worth as of February 2,1975 and February 1, 1976) in the amount of $76,240.[2]
New Jersey’s corporate business tax is measured by two separate calculations: one based on net worth, the other, not implicated in this case, on net income. While N.J.S.A. 54:10A-4(d) denotes those items that are to be included in the net worth *56 base, it is § 4(d)(5)[3] which is specifically pertinent to the issue in this proceeding:
‘Net worth’ shall mean the aggregate of the values disclosed by the books of the corporation for (1) issued and outstanding capital stock, (2) paid-in or capital surplus, (3) earned surplus and undivided profits (4) surplus reserves which can reasonably be expected to accrue to holders or owners of equitable shares, not including reasonable valuation reserves, such as reserves for depreciation or obsolescence or depletion, and (5) the amount of all indebtedness owing directly or indirectly to holders of 10% or more of the aggregate outstanding shares of the taxpayer’s capital stock of all classes, as of the close of a calendar or fiscal year. [Emphasis supplied]
“Indebtedness owing directly or indirectly” has been statutorily defined in N.J.S.A. 54:10A-4(e) as follows:
‘Indebtedness owing directly or indirectly’ shall include, without limitation thereto, all indebtedness owing to any stockholder or shareholder and to members of his immediate family where a stockholder and members of his immediate family together or in the aggregate own 10% or more of the aggregate outstanding shares of the taxpayer’s capital stock of all classes. [Emphasis supplied]
It is undisputed that Toys-NJ was a wholly-owned subsidiary of Interstate and thus met the requirement of the “10% or more” shareholder provision. It is also undisputed that the loans were made between Toys-NJ and its parent Interstate through their intercompany account.
Interpreting the foregoing statutes, plaintiff, Toys “R” Us, Inc., claims that the loans from Interstate to Toys-NJ should not have been included in the Toys-NJ net worth component for fiscal years 1974 and 1975. It bases this claim on two main contentions. First, it argues that to include these loans in Toys-NJ’s net worth defeats the Legislature’s purpose and intent in enacting § 4(d)(5).
Plaintiff emphasizes that the underlying rationale of the original law was to prevent “a [controlling] shareholder from infusing large amounts of capital into a corporation and disguising it as debt” in order to reduce net worth and avoid payment of a higher franchise tax. Plaintiff argues that the bankruptcy *57 reorganization proceedings divested Interstate of control over any intercompany transaction with Toys-NJ, and thus, the statutory requirement for includability of indebtedness in net worth is inapplicable to plaintiff under the facts of this case. In the same vein plaintiff also contends that Toys-NJ had sufficient cash reserves to discharge the indebtedness to Interstate and would have, in fact, repaid the loans, as was its custom, were it not prohibited from doing so by a district court bankruptcy order.
Secondly, plaintiff contends that although the loans were outstanding to Interstate, they were in reality owed to outside creditors. For this reason, plaintiff concludes that because Interstate was a mere conduit for payment of the loans by Toys-NJ to the institutional creditors of Interstate, Toys-NJ is not subject to the provisions of § 4(d)(5).
On the other side of the coin, the Director contends that includability of indebtedness in the net worth component of the corporate franchise tax does not depend on the ability of a parent company to convert a subsidiary’s debt into equity nor on the parent company’s degree of control over its affiliates[4]. The Director also argues that at the end of the taxable years in dispute, the Toys-NJ’s loans were directly owed to Interstate through the intercompany account and not to outside creditors. Thus, the Director maintains that plaintiff’s case fits the clear language of the statute for includability of these loans in Toys-NJ’s net worth.
I
Plaintiff’s first argument is based on the premise that the original legislative purpose and intent of § 4(d)(5) was to prevent shareholders with 10% or more of a corporation’s stock from injecting large amounts of capital into a corporation and *58 then disguising it as debt in order to gain a tax advantage. Werner Machine Co. v. Zink, 6 N.J.Super. 188, 194, 70 A.2d 774 (App.Div.1950). The ultimate objective of the Legislature was to insure that all corporations would be subject to an equal tax burden whether they chose to operate through debt financing or on an equity capital basis. Id. at 193, 70 A.2d 774; see also Kingsley v. Hawthorne Fabrics, Inc., 41 N.J. 521, 525, 197 A.2d 673 (1964). Recently, our Supreme Court reaffirmed the Werner rationale by stating that “the legislative intent was to determine a corporation’s net worth by including its real capitalization, whether reflected by its capital stock and surplus or by debt owing to its parent. Not any and all debt was to be included, but only that furnished directly or indirectly by the parent.” Fedders Financial Corporation v. Taxation Div. Dir., 96 N.J. 376, 391, 476 A.2d 741 (1984). Consequently, for plaintiff, the key question is whether the parent company had direct or indirect control over its subsidiary’s business operations so that Interstate could manipulate Toys-NJ’s balance sheet, disguising equity as debt with the intent to diminish the franchise tax. Absent this underlying presumption, plaintiff maintains that its loans from Interstate should not be included in its net worth calculation for payment of New Jersey’s corporate franchise tax.
To support its contention that Interstate had relinquished control over Toys-NJ for the disputed tax years, plaintiff claims that once bankruptcy petitions were filed by Interstate and all of its subsidiaries, operative control no longer resided with Interstate but rather was transferred entirely to the bankruptcy trustees in 1974. This changeover in Interstate’s management, plaintiff states, supports its contention that the opportunity for manipulating Toys-NJ’s finances was foreclosed.
Besides Interstate’s lack of manipulative control over the debt-equity balance of Toys-NJ, plaintiff also claims that the reorganization proceedings restricted Toys-NJ’s ability to remit its excess cash to pay off Interstate’s intercompany loans. At the request of the bankruptcy trustees, the district court issued *59 an order placing a “freeze” on all money transfers (with one minor irrelevant exception) from Toys-NJ to Interstate. It was this alleged involuntary prohibition that allowed Toys-NJ to accumulate excess funds on its balance sheet, funds which otherwise would have been transferred to Interstate if Toys-NJ had been permitted in its ordinary course of business to discharge its financial obligations to Interstate. Because Interstate was stripped of its control over Toys-NJ’s internal finances and because Toys-NJ was prevented from repaying Interstate’s loans during the reorganization proceedings, plaintiff maintains that the legislative purpose of the 10% shareholder provision is absent under the facts of this case. For this reason, plaintiff concludes that inclusion of indebtedness owed to Interstate in Toys-NJ’s net worth figure “would be an impermissible extension of [§ 4(d)(5) ] beyond that which it was intended to reach.”
In answer to plaintiff, defendant states that Interstate’s loans to Toys-NJ were includable in plaintiff’s net worth because under § 4(d)(5) the question “is simply whether the debt is debt” at the end of the taxable year. Defendant claims that a corporation’s intent to convert debt into equity is irrelevant to the determination of the includability of debt in that corporation’s net worth. The controlling fact, defendant continues, is merely whether, within the taxable time frame, there was any outstanding indebtedness between the parent company and its subsidiary.
Although manipulation of intercompany finances may have been the original impetus to enact § 4(d)(5), defendant continues, the statute is not limited in its reach to that purpose alone. To substantiate this point, defendant relies on cases in which manipulation was not the primary intent and yet, the courts held that the indebtedness was includable in net worth. In Skyline Industries v. Taxation Div. Dir., 3 N.J.Tax 612 (Tax Ct.1981), this court noted that § 4(d)(5) was “not limited in its reach to forms of indebtedness representing disguised capital.” Id. at 618. This acknowledgment was based on the Appellate Division decisions in Cliffside Dyeing Corp. v. Zink, 6 N.J.Su *60 per. 185, 70 A.2d 778 (App.Div.1950) and Werner Machine Co. Inc. v. Zink, supra. In Cliffside it was held that salaries, bonuses and dividends due holders of 10% or more of a corporation’s stock, liabilities which apparently did not represent contributions to capital, constituted indebtedness to be included in the calculation of net worth. In Werner accruals of interest were held to constitute includable indebtedness. See also GATX Terminals Corp. v. Taxation Div. Dir., 5 N.J.Tax 90, 97-98 (Tax Ct.1982), aff’d o.b. 7 N.J.Tax 659 (App.Div.1985), certif. den. 102 N.J. 337, 508 A.2d 213 (1985); Stinnes Interoil, Inc. v. Taxation Div. Dir., 7 N.J.Tax 473 (Tax Ct.1985). Defendant thus maintains that the decisional law clearly demonstrates that all indebtedness owed by a subsidiary to its parent corporation must be included in the net worth computation regardless of the motivation for incurring the debt.
Although the impetus for the enactment of § 4(d)(5) may have been to prevent intercorporate manipulations designed to avoid higher franchise taxes, there is no reason to assume that the original purpose of the legislation strictly confines or limits the applicability of the 10% provision. In Skyline, supra, this court also noted that:
Although the initiating cause or purpose of legislation may be an aid in statutory interpretation, it does not thereby limit the applicability of that legislation solely to the facts which constituted that cause ... when the language used is more comprehensive in scope. [3 N.J. Tax at 620]
In a more recent decision by the Tax Court plaintiff-taxpayer objected to the includability of loans made by a former affiliated corporation in its net worth on the grounds that to do so violated the original intent and purpose of the statute. GATX Terminals Corp. v. Taxation Div. Dir., supra. The court reasoned that
While the statement of legislative purpose upon which plaintiff relies is not incorrect, it is obviously not the sole purpose. Rather, the basic purpose of the 10% rule was to tax corporations doing business in New Jersey in a manner which would equitably reach the assets employed in that business. Whether or not the 10% stockholders were attempting to thwart the imposition of the tax is not dispositive. [5 N.J.Tax at 98]
The court in GATX stated that even if, arguendo, it were to hold that prevention of internal financial manipulation was the *61 sole purpose of the statute, the principle enunciated in Skyline, supra, provided the controlling rule of law.
Plaintiff further argues that the recent Supreme Court cases of Fedders Financial Corp., supra and Mobay Chemical Corp. v. Taxation Div. Dir., 96 N.J. 407, 476 A.2d 758 (1984) support its argument to exclude Toys-NJ’s indebtedness to Interstate from Toys-NJ’s net worth. Plaintiff perceives these cases as a rejection of “blind adherence” to statutory language and strict statutory construction. The gist of plaintiff’s argument in this regard is that Fedders and Mobay now direct a new analytical approach to § 4(d)(5) cases. Plaintiff urges that this court consider a subjective factual analysis to determine if, in fact, in any given case there was an attempt to manipulate or maneuver in order to reduce the franchise tax thereby thwarting the sole legislative purpose of the 10% rule.
Defendant contends that both Fedders and Mobay are factually different from the present case and in addition the legal issue is totally different, therefore a subjective judicial inquiry is not required in this case. I agree.
In both Fedders and Mobay the indebtedness was not directly owed to a parent corporation but to an affiliated corporation controlled by the parent. Thus, the focus of the Court was on whether the indebtedness was indirectly owed to the parent corporation. Writing for the majority in Fedders, Justice Schreiber rejected any per se rule which automatically included in a taxpayer’s net worth computation any loan from an affiliated corporation regardless of whether the loan emanated directly or indirectly from the parent corporation. Fedders, 96 N.J. at 392, 476 A.2d 741. The Court differentiated between direct and indirect indebtedness. Id. at 388-389, 476 A.2d 741. The Court reaffirmed the principle that a debt owed directly to a parent company, regardless of the source of the funds loaned by the parent company, is to be included in the net worth of the subsidiary. Id. at 386-388, 476 A.2d 741; see General Public Loan v. Taxation Div. Dir., 13 N.J. 393, 99 A.2d 796 (1953). However, funds borrowed by a taxpayer corpo *62 ration from an affiliated corporation (not the parent) are to be included in the net worth of the taxpayer only if the funds are indirectly owed to the parent of the taxpayer corporation. The taxpayer has the burden of demonstrating that the funds loaned by an affiliated corporation were generated from the affiliate’s own operations or were truly owed to third-party creditors and not indirectly owed to the taxpayer’s parent corporation. Id. at 389, 99 A 2d 796. Thus, there is a need for a factual or subjective inquiry whenever an indebtedness is owed to an affiliated corporation controlled by a common parent to determine if, in fact, the debt is indirectly owed to the parent corporation. But there is no requirement for a subjective factual analysis when loans are made directly by a parent corporation to its wholly-owned subsidiary because this latter situation meets the express requirements of § 4(d)(5) thereby obviating any further inquiry.
In the present matter, it is undisputed that the loans were made by the parent company, Interstate, to its wholly-owned subsidiary, Toys-NJ. The factual scrutiny required by Fedders and Mobay is simply not necessary under the facts of this case.
Plaintiff asserts that the inclusion of the indebtedness to Interstate in Toys-NJ’s net worth would ignore the realities of the situation and amounts to a mechanical application of § 4(d)(5), therefore this court should engage in a “pragmatic approach” to achieve a result not within the expressed statutory language.
This assertion overlooks the first of two principles of statutory construction noted by our Supreme Court in Fedders. It noted that courts generally “should follow the clear import of statutory language.” Fedders, 96 N.J. at 384-385, 476 A.2d 741. In this regard the Court indicated that the Legislature must express its intention to tax in distinct and unambiguous language. Id. at 386, 476 A.2d 741. In those situations where the legislative body has expressed its intent distinctly and unequivocably, a literal application of the statutory language is required. In support of this conclusion the Court reviewed the *63 opinions in the cases of General Public Loan Corp. v. Taxation Div. Dir., supra; R.H. Macy & Co. v. Taxation Div. Dir., 77 N.J.Super. 155, 185 A.2d 682 (App.Div.1962), aff’d o.b. 41 N.J. 3, 194 A. 2d 457 (1963) and Somerset Apts. Inc. v. Taxation Div. Dir., 134 N.J.Super. 550, 342 A.2d 520 (App.Div.1975) and stated that since the statutory language in each case was unambiguous a literal application of the statute compelled each result. Id. 96 N.J at 386-388, 476 A.2d 741.
Similarly, in this case, as in those cases, the guiding principle is the plain, clear, unambiguous meaning of the law as gleaned from the written words of the statute. State v. Butler, 89 N.J. 220, 445 A.2d 399 (1982). As noted in Butler,
As a general rule of statutory construction, we look first to the language of the statute. If the statute is clear and unambiguous on its face and admits of only one interpretation, we need delve no deeper than the act’s literal terms to divine the Legislature’s intent. [Id. at 224, 445 A.2d 399]
If there is some ambiguity, vagueness or uncertainty as to the wording or meaning of the statute, then and only then, can a court proceed to judicially construe the law. DeHart v. Bambrick, 177 N.J.Super. 541, 427 A.2d 113 (App.Div.1981). Courts are not at liberty to rewrite legislation in order to make it comport with their own judicial ideal of fairness. The decisional law in this State dictates that “where the wording of a statute is clear and explicit [a court is] not permitted to indulge in any interpretation other than that called for by the express words set forth.” Duke Power Co. v. Patten, 20 N.J. 42, 49, 118 A.2d 529 (1956). Thus, if a particular statute is unambiguous and clear on its face, it is improper for a court to impose any interpretation or construction beyond the express meaning of the language in the law. Alling Street Urban Renewal Co. v. City of Newark, 204 N.J.Super. 185, 191, 497 A.2d 1287 (App.Div.1985); Matter of Sussex Cty. Municipal Utilities, 198 N.J.Super. 214, 486 A.2d 932 (App.Div.1985); MacMillan v. Taxation Div. Dir., 180 N.J.Super. 175, 177, 434 A.2d 620 (App.Div.1981); R.H. Macy v. Taxation Div. Dir., supra, 77 N.J.Super. at 173, 185 A.2d 682.
*64 The relevant portion of the statute at issue, i.e., § 4(d)(5), is clear, unambiguous and explicit. It states that any indebtedness owed to a 10% or more shareholder in the taxpayer corporation at the close of the taxable year must be included in the net worth calculation for the corporate franchise tax. In addition, the scope of the includability of indebtedness under the above mentioned statute is comprehensive as denoted by the language “without limitation thereto” in the definition of “indebtedness owing directly or indirectly.” N.J.S.A. 54:10A-4(e).
Here, Toys-NJ had a liability due Interstate of $15,925,-137.29 at the end of its 1974 fiscal year and a liability due Interstate of $19,882,144 at the end of its 1975 fiscal year. The statute clearly and explicitly directs the inclusion of such amounts in the computation of Toys-NJ’s net worth. There is nothing in the statutory language which permits this court to carve an exception to the explicit statutory provision. If the Legislature had intended to limit the operation of § 4(d)(5) it could have expressed that intention in direct and specific language. It did not. On the contrary, here the Legislature has expressed its intention to tax in clear and unequivocal language. It was this legislative use of clear and unequivocal language that caused Justice Proctor to characterize the 10% stockholder provision as a “conclusive [presumption] that a corporate indebtedness owing to a 10% stockholder ... is equity capital.” Kingsley v. Hawthorne Fabrics, Inc., supra, 41 N.J. at 525, 197 A.2d 673.
In spite of plaintiffs argument that this court should avoid a mechanical application of the plain language of § 4(d)(5), plaintiff has cited no authority nor is this court aware of any that permits this court to take liberties with clearly expressed statutory language in order to achieve a result not effectuated by the act as written.
Plaintiff has not challenged the constitutionality of the statute in question. Absent any constitutional constraints it is the function of this court to enforce the legislative directive as *65 embodied in the explicit statutory language of § 4(d)(5) even though that may be characterized as “mechanical.”
II
Plaintiffs second contention is that the indebtedness owed to Interstate on the intercompany account was, in reality, through the bankruptcy proceedings, transformed into a debt owed to Interstate’s institutional creditors. Plaintiff argues that a debt owed to creditors other than the parent corporation is not subject to includability in the net worth factor of the corporate franchise tax. See Fedders and Mobay, supra. Thus, plaintiff contends that because the loan guarantees made by Toys-NJ on behalf of Interstate in 1973 became real obligations to the institutional creditors in 1974, the year the bankruptcy petitions were filed, Interstate was a mere conduit for the repayment of debt to these outside creditors.
Defendant argues that the intercompany debt owed to Interstate and the loan guarantees made by Toys-NJ were two separate and distinct obligations effective at different points in time. While the loan guarantees were executed in 1973, Toys-NJ’s debt to Interstate was incurred in 1974 and 1975. Despite the guarantee agreement with outside creditors, plaintiff increased its intercompany debt to Interstate in 1975 in the amount of $3,957,007. Defendant also emphasizes the distinction between a debt and a guarantee. A debt is due and owing when incurred. A loan guarantee is a future potential liability that is triggered only when the principal debtor defaults on payment. In this case, defendant explains, plaintiff’s debts were due and owing to Interstate for 1974 and 1975 when they were incurred. The loan guarantees to outside creditors, however, were not an actual liability until 1978 when the reorganization plan utilized Toys-NJ’s cash reserves to pay off Interstate’s creditors and to form the new corporate entity, Toys “R” Us, Inc.
In addition, defendant contends that the district court bankruptcy order was issued solely to prevent the depletion of *66 Toys-NJ’s cash reserves for the benefit of outside creditors with no reference to the loan guarantees. The intercompany transactions between Toys-NJ and its parent, defendant continues, remained unaffected by the court order. Furthermore, defendant rejects plaintiff’s argument that Interstate was a mere conduit for the payment of loans. Defendant maintains that plaintiff’s contention not only directly contravenes well-settled law but would also require the court to pierce the corporate veil, treating the corporate structure of Interstate and its subsidiaries as a mere sham. Thus, defendant concludes, plaintiff’s indebtedness to its parent must be included in plaintiff’s net worth component for 1974 and 1975.
A factual examination of plaintiff’s activities and relations with its parent, Interstate, indicates that Interstate did not function as a mere “shell” corporation for the benefit of Toys-NJ. From the time in 1974 when Interstate and its subsidiaries filed bankruptcy petitions, Interstate’s corporate structure, as a parent holding company, remained intact until the final reorganization in 1978. The trustees were instructed to maintain and preserve Interstate by carrying out any business functions necessary to continue the status quo of the corporation. Interstate retained its corporate identity and was not just a passive entity devoid of control throughout the bankruptcy process.
The financial transactions between Toys-NJ and its parent corporation evidence the continuous, ongoing relationship that was maintained until the final merger in 1978. Despite the precarious financial position of Interstate in relation to its outside creditors, Toys-NJ continued to borrow funds from its parent in 1974 and 1975 to facilitate its ordinary business activites. While operating under the supervision of the bankruptcy trustees, Toys-NJ increased its retail chain by 16 stores, an expansion supported mainly by internal company financing. Furthermore, in all the balance sheet statements issued by its certified auditors during the reorganization proceedings, Toys-NJ was treated as an integrated financial entity of Interstate. During the disputed tax years, the Toys-NJ chain of stores filed a consolidated tax return with its parent corporation *67 thereby realizing significant federal tax savings. On the consolidated balance sheet for the year ending February 2, 1975, separate items designated “Assets due from parent” as $526,-000 and “Due to parent” as $19,937,000, attests to the continuous intercompany financial transactions which were maintained throughout the bankruptcy proceedings.
Moreover, nowhere in the voluminous financial accountings was Toys-NJ designated as a separate creditor or debtor of the parent corporation by the institutional creditors or the trustees. All negotiations were conducted between the institutional creditors, the bankruptcy trustees, and Interstate. Toys-NJ was regarded as merely a profitable subsidiary of the parent corporation. Subsequently, it was the parent company’s ownership of Toys-NJ’s stock and the equity therein, that provided sufficient funds to enable the creditors of Interstate to recoup their losses and receive adequate compensation for their claims.
Having adopted and fully utilized the parent-subsidiary relationship to its financial and tax advantage, plaintiff will not be permitted thereafter to deny its corporate structure to avoid tax liability. Somerset Apts., Inc. v. Taxation Div. Dir., 134 N.J.Super. 550, 555-556, 342 A.2d 520 (App.Div.1975). Toys-NJ and Interstate voluntarily filed petitions and made no objections to the “freeze” order on Toys-NJ’s assets. The parent corporation and plaintiff voluntarily chose to file for bankruptcy to effectuate payment to its creditors. It cannot now ask this court to relieve it of the tax consequences of its own voluntary acts. In General Trading v. Taxation Div. Dir., 83 N.J. 122, 416 A.2d 37 (1980), the taxpayer corporation inadvertently issued 10 million additional shares of stock two days before the end of its fiscal year. The question centered on whether taxpayer’s liability could be avoided when the taxpayer later discovered the error and wanted to reverse the adverse tax consequences of its actions. The court concluded that the applicable legal principle was “not what might have happened or what the taxpayer could have done but what actually occurred that determine[d] the tax consequences.” Id. at 138, 416 A.2d 37.
*68 The maxim of General Trading, that tax consequences turn on actual events, not on the cause of those events, is apropos to plaintiffs case. The bankruptcy petitions voluntarily submitted by Interstate and its subsidiaries preempted the presumably inevitable litigation by Interstate’s creditors to recover their loans. The court-ordered “freeze” although an involuntary imposition on Toys-NJ’s cash assets, benefited Toys-NJ during the bankruptcy proceedings by allowing it to build up a large cash reserve and improve its credit status apart from Interstate. It also provided Interstate with an acceptable way to partially pay off its creditors and helped the newly-formed Toys “R” Us, Inc. to establish financial credibility after the merger.
Even assuming, however, that the district court bankruptcy order requires this court to characterize the actions of Toys-NJ as involuntary, the voluntariness or involuntariness of a taxpayer’s actions is irrelevant in determining whether there are taxable consequences. It is the actual circumstances of the taxpayer within the disputed tax years that is the sole dispositive factor.
As correctly noted by defendant, the loan guarantees secured by the stock of Toys-NJ and the other subsidiaries did not require Toys-NJ to be directly obligated to the institutional creditors until Interstate actually defaulted on the loans. It is only when those guarantees were actually triggered that the loans from Interstate’s creditors would bring liability for payment to bear on Toys-NJ and result in actual financial responsibility for Toys-NJ. See Fedders Financial Corp., supra, 96 N.J. at 391, 476 A.2d 741 (Loan guarantee does not make corporation issuing the guarantee a creditor until the guarantee is triggered).
The argument that a parent corporation was merely a conduit for a subsidiary to repay indebtedness actually owed to outside creditors was firmly rejected in General Public Loan Corp. v. Taxation Div. Dir., supra. In that case, taxpayer was engaged in the business of making small loans. To facilitate its lending activities, it borrowed money regularly from its parent *69 corporation which in turn obtained loans from banks and insurance companies. Plaintiff attempted to argue that its indebtedness was in fact owed to these outside creditors and not to the parent company. The court rejected taxpayer’s argument that its parent corporation was a mere conduit for the repayment of the loans. It also stated that the corporate structure once voluntarily adopted by the parent and its subsidiary should prevail in determining General’s taxable net worth figure.
More recently, in Stinnes Interoil, Inc. v. Taxation Div. Dir., supra, taxpayer argued that the parent corporation was a mere conduit for the flow of funds transferred directly from the taxpayer to an intermediate banking facility. In Stinnes, taxpayer and its parent corporation used two bank accounts set up by the parent company through which to funnel its cash flow. The parent corporation guaranteed all loans taken by its subsidiaries from a concentration account and kept a daily accounting of the credits and debits of this account through individual zero balance accounts for each subsidiary. Taxpayer argued that the debt was owed to the banking facility, not to the parent corporation. The court held, however, that the financial transactions between taxpayer and the parent corporation were not merely arm’s length transactions, but the parent corporation was in reality loaning money and guaranteeing the loans of its subsidiaries, albeit through a third party financial mechanism. Thus, the court concluded, the parent corporation was not merely a conduit for the transfer of funds from the subsidiary to the bank but was, in fact, the principal creditor and guarantor of the subsidiary’s lending activities. The resulting indebtedness attributable to taxpayer was thus includable in its net worth.
Similarly, Toys-NJ cannot disclaim Interstate as a parent corporation by arguing that it was a mere conduit for debt repayment to outside creditors. The factual circumstances noted above prove otherwise. Undoubtedly, Toys-NJ as the sole profitable business venture of Interstate realized that the bankruptcy proceedings would eventually lead to a financial settlement based on the distribution of Toys-NJ’s cash assets. *70 Nonetheless, the indisputable fact remains that during 1974 and 1975 the parent-subsidiary relationship between Toys-NJ and Interstate was left unimpaired. The underpinnings of a tax statute are grounded on the applicability of the factual events to the express language in the law. In this case, plaintiff’s relationship with Interstate conforms squarely to the net worth requirements of § 4(d)(5). Consequently, plaintiff’s second argument characterizing Interstate as a conduit for debt payment to outside institutional creditors must be rejected.
Based on the foregoing the determination of the Director is affirmed. The Clerk of the Tax Court is directed to enter judgment accordingly.

 Prior to February 1, 1978, which is when the reorganization plan was submitted and approved, Toys-NJ had accumulated $24,314,930 as of February 2, 1975, $41,541,640 as of February 1, 1976, $54,691,980 as of January 30, 1977 and $73,185,691 as of January 29, 1978.

 Plaintiff originally claimed a refund of $100,752, however, the parties subsequently agreed that a partial refund was in order for reasons not relevant to the present matter. Plaintiffs refund claim was accordingly reduced to $76,240.

 The Legislature has repealed subsection (5), L. 1982, c. 55, § 1, effective July 1, 1984, nevertheless this provision is still relevant here because plaintiffs case involves tax years prior to the statute’s amendment.

 Although the Director does not make the argument, it is noteworthy that § 4(d)(5) by its own terms does not mandate control since it includes a shareholder with a less than controlling interest of 10%.