653 A.2d 1131

ROLLINS LEASING CORPORATION, PLAINTIFF–APPELLANT,
v. DIRECTOR, DIVISION OF TAXATION, DEFENDANT–
RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued September 19, 1994—Decided October 20, 1994.

Before Judges PETRELLA, BROCHIN and CUFF.

*Jonathan M. Gross* argued the cause for appellant (*Hannoch Weisman*, attorneys; *Mr. Gross* of counsel and on the brief; *Nina L. Dunn*, also on the brief).

*Gail L. Menyuk*, Deputy Attorney General, argued the cause for respondent (*Deborah T. Poritz*, Attorney General, attorney; *Joseph L. Yannotti*, Assistant Attorney General, of counsel; *Ms. Menyuk*, on the brief).

The opinion of the court was delivered by

PETRELLA, P.J.A.D.

This appeal concerns whether Rollins Leasing Corporation (Rollins), the taxpayer, properly deducted interest expenses on certain notes payable to a trustee for debenture holders on its Corporation Business Tax (CBT) returns for the years between October 1, 1984 and September 30, 1989. Rollins appeals from the December 13, 1993 order and final judgment entered in favor of the Director,

Division of Taxation (Director), by the Tax Court, which upheld the Director's disallowance of certain interest deductions.

The matter was tried in the Tax Court largely on stipulated facts, and the decision is reported at 13 *N.J.Tax* 359. Rollins, a Delaware corporation, is a wholly-owned subsidiary of Rollins Truck Leasing Corporation (RTL),[1] a publicly-held company listed on the New York Stock Exchange. Rollins is engaged in leasing, renting, and maintaining trucks, tractors, and trailers.

To provide Rollins with cash for its operations, RTL issued a series of debentures in the public market between April 18, 1983 and March 15, 1989.[2] At the same time, RTL transferred the funds raised to Rollins in exchange for a promissory note payable to RTL, and in accordance with various loan agreements and a collateral trust indenture, dated as of March 21, 1983 (with various subsequent supplements).

All documents acknowledged that they were subject to the March 21, 1983 trust indenture (and subsequently also to seven supplements thereto) between RTL and Continental Illinois National Bank and Trust Company of Chicago (Continental), Trustee for RTL's debenture holders. The latter corporation is a publicly-held banking institution and is unrelated to Rollins, RTL, or any affiliates.

In all, eight promissory notes were issued according to the loan agreements, under which Rollins and RTL agreed to the assignment and negotiation of the notes and loan agreements, as security, to Continental. RTL first assigned its "right, title and inter-

---

[1] RTL is also a Delaware corporation. Prior to changing its name on January 26, 1990, RTL's corporate name was RLC Corporation. As a matter of convenience, we use the RTL designation. According to testimony at the hearing, RTL is merely "a holding company" and its only assets, other than "small amounts of furniture," are the stock of several subsidiaries, including Rollins.

[2] Rollins, as a private company, had no bond rating. Thus, to access the public market, it borrowed money from the public through its parent, RTL. Counsel for Rollins conceded that using RTL as a financial "conduit" was "more advantageous," but refused to acknowledge that Rollins could not raise capital by pursuing other avenues.

est" in the notes to Continental in an April 18, 1983 "Assignment of Loan Agreement," which Continental also signed and accepted. Rollins consented to the assignment. The assignment agreement referred to the terms of the collateral trust indenture (and any supplements thereto). Consequently, Rollins paid the principal and interest on the promissory notes directly to Continental. Significantly, the loan agreement provided Continental, as holder of the notes, with the following remedies in the event Rollins defaulted:

SECTION 10. *Remedies.* The holder of the Note, being a party to, or an assignee of, this Agreement, shall be entitled and empowered to institute any suits, actions or proceedings at law, in equity or otherwise, whether for the specific performance of any covenant or agreement contained herein or in the Note or in aid of the exercise of any power granted herein or in the Note, or may proceed to enforce the payment of the Note after demand, or to enforce any other legal or equitable right as holder of the Note, or may proceed to take any action authorized or permitted under the terms of the Indenture with respect to the Note or under any applicable law.

The loan agreement further provided in Section 11:

Every remedy given hereunder to the holder of the Note shall not be exclusive of any other remedy or remedies, and every such remedy shall be cumulative and in addition to every other remedy given hereunder or now or hereafter given by statute, law, equity or otherwise.

Section 12 of the loan agreement stated:

*Successors and Assigns.* All the covenants, warranties and agreements contained in this Agreement by or on behalf of the Corporation, the Borrower or the holder of the Note shall bind and inure to the benefit of their respective successors and assigns, whether so expressed or not.

On July 23, 1991, the Director issued a notice of tax assessment to Rollins and assessed CBT deficiencies totaling $251,936, plus interest and penalties, for the taxable periods between October 1, 1984 through September 30, 1989. These deficiencies resulted, in part, because the Director disallowed certain amounts Rollins had excluded as interest expense on its CBT returns. 13 *N.J.Tax* at 362. Rollins protested the assessment, and the parties subsequently conferred. The Director then issued "a revised final determination in the amount of $239,063, plus penalties and interest." *Ibid.*

The Tax Court upheld the final determination of the Director (with minor modifications to the amount owed by Rollins), reasoning that RTL was the primary obligor under the debenture agreements. *Id.* at 369. Although the Tax Court appropriately ruled out indirect payments of the debt from Rollins to RTL, *id.* at 369–370, it then found that the payments were direct payments owing from Rollins to RTL, stating:

> The use of a trustee and the negotiation of the notes are integral parts of the transaction in which the parent has borrowed directly for the purpose of lending to its subsidiary. The payments by taxpayer to the trustee constitute a repayment by the subsidiary of the parent's primary obligation to repay the debentures. Therefore, the loan repayments must be treated as loan repayments by the subsidiary to its parent.

[*Id.* at 370.]

## I.

Rollins basically asserts that although it had borrowed the funds from RTL, Rollins owed its indebtedness directly to Continental. Once Continental became a holder of the promissory notes it could, among other things, enforce payment of the notes in its own name. RTL, as the endorser, could not sue and recover from Rollins unless RTL paid the obligation and re-acquired possession of the notes. Rollins reasons that it was primarily obligated to Continental, as holder of the notes, for repayment of the loan, while RTL was secondarily liable or a guarantor. Thus, Rollins concludes, the debentures were not a debt instrument of Rollins, but rather, the notes constituted Rollins' obligation to an unaffiliated lender.

The Director, on the other hand, contends that Rollins owed its debt directly to RTL, not to Continental or the debenture holders, and that RTL cannot "change the fact" that Rollins was directly indebted to RTL because RTL required Rollins to pay its debentures. According to the Director, Continental did not take the endorsed promissory notes from RTL in exchange for its obligation under the debentures, but, instead, "as *security* or collateral" for RTL's obligations. The Director also asserts that RTL

pledged the notes to Continental to ensure that it would use Rollins' loan payments to retire its debt obligation to the debenture holders. Under that approach, Rollins was, in effect, a guarantor of RTL's obligations under the debentures. The Director also argues that the endorsements of the notes were restrictive, rather than unconditional, and, thus, RTL only transferred to Continental a security interest in the notes, not an outright ownership of Rollins' indebtedness.

The Director further argues that Continental could only have transferred, negotiated, discharged, or enforced payment of the notes upon event of default and, until that happened, the notes constituted collateral and were held as security for RTL's debt obligation. Under this view, the Director contends that there was only a pledge of Rollins' debt by RTL as security for its own debt and, thus, this did not convert Rollins' debt from a direct indebtedness to RTL into a direct indebtedness to Continental, nor relieve Rollins of its indebtedness to RTL. Finally, the Director maintains, without basis in the record, that Rollins made its payment to Continental at the direction of RTL and not as a consequence of any direct indebtedness of Rollins to Continental. This argument implies that any secondary obligation Rollins had to Continental came into existence only as a consequence of Rollins' direct obligation to RTL and the promises Rollins made to RTL in consideration for the loan.

## II.

The New Jersey Corporate Business Tax Act (Act), *N.J.S.A.* 54:10A–1 to –40, is an annual franchise tax on a domestic or foreign corporation "for the privilege of having or exercising its corporate franchise in this State, or for the privilege of doing business, employing or owning capital or property, or maintaining an office, in this State." *N.J.S.A.* 54:10A–2. The tax is computed

by adding prescribed percentages of a net worth [3] and net income tax base. *N.J.S.A.* 54:10A–4(d), 4(k), and 5.

The Act imposes a tax on the entire net income of a corporation, computed without exclusion, deduction, or credit of "90% of interest on *indebtedness owing directly or indirectly* to holders of 10% or more of the aggregate outstanding shares of the taxpayer's capital stock of all classes. . . ." *N.J.S.A.* 54:10A–4(k)(2)(E) (emphasis added). The phrase " '[i]ndebtedness owing directly or indirectly' [includes], without limitation[,] . . . all indebtedness owing to any stockholder or shareholder and to members of his immediate family where a stockholder and members of his immediate family together or in the aggregate own 10% or more of the aggregate outstanding shares of the taxpayer's capital stock of all classes." *N.J.S.A.* 54:10A–4(e). *See also N.J.A.C.* 18:7–4.5(b). Thus, a corporation can only reduce its "net income" by ten percent of the interest on indebtedness owing directly or indirectly to a person or entity owning ten percent or more of the corporation's capital stock. *GATX Terminals Corp. v. Taxation Div. Director,* 5 *N.J.Tax* 90, 96 (Tax 1982), *aff'd,* 7 *N.J.Tax* 659 (App.Div.), *certif. denied,* 102 *N.J.* 337, 508 *A.2d* 213 (1985).

In construing the phrase "indebtedness owing directly or indirectly," the Court has unequivocally stated that "[i]t is the indebtedness of the taxpaying corporation that must be *owed to the stockholder* " or controlling entity; indeed, "[i]t is crucial . . . that the direct debt be owed to the parent or controlling stockholders." [4] *Fedders Financial Corp. v. Director, Div. of Taxation,* 96

---

[3] *N.J.S.A.* 54:10A–5(a), phased out the net worth component for accounting periods beginning on or after April 1, 1983. The net worth component no longer applies to accounting or privilege periods beginning on or after July 1, 1986. The net worth component would only apply here to the period between October 1, 1984 and September 30, 1986, as Rollins' fiscal year begins October 1.

[4] The Court initially analyzed the phrase "indebtedness owing directly or indirectly" for purposes of calculating net worth (as defined in *N.J.S.A.* 54:10A–4(d)(5) [which was eliminated by *L.*1982, *c.* 55, § 1, eff. July 1, 1984] ), but stated that the "statute contains a single definition of the phrase 'indebtedness owing

*N.J.* 376, 388–389, 476 *A*.2d 741 (1984). In *Fedders*, taxpayer Fedders Financial Corporation was a wholly-owned subsidiary of Fedders Corporation (Fedders). Taxpayer created and capitalized its own wholly-owned foreign subsidiary, Fedders Capital, to raise foreign monies in the Eurodollar market. In 1972, Fedders Capital sold $30,000,000 worth of debentures; which were guaranteed by taxpayer's parent, Fedders, to unrelated foreign investors. Taxpayer, during 1972 to 1974, borrowed those funds from Fedders Capital. In short, the Court allowed taxpayer to exclude from its net worth debts owed to Fedders Capital and, in addition, to deduct the entire amount of interest paid on that indebtedness.

To determine what constituted "indebtedness owing directly or indirectly" between a parent corporation and its wholly-owned subsidiary, *Fedders, supra,* relied upon *General Pub. Loan Corp. v. Director of Div. of Taxation,* 13 *N.J.* 393, 99 *A*.2d 796 (1953). In *General Pub. Loan Corp.,* the Court strictly interpreted a provision of the Financial Business Tax Law *N.J.S.A.* 54:10B–2(c)(5),[5] which was similar to that involved here (*N.J.S.A.* 54:10A–4(k)(2)(E)). The taxpayer, a subsidiary, argued that it did not owe its corporate parent money even though the taxpayer had borrowed funds from the parent from time to time because the parent had "borrowed" from banks and insurance companies. The tax-

---

directly or indirectly,' *N.J.S.A.* 54:10A–4(e), applicable to both the net worth and net income provisions," in particular *N.J.S.A.* 54:10A–4(k)(2)(E). *Fedders Financial Corp. v. Director, Div. of Taxation,* 96 *N.J.* 376, 391, 476 *A*.2d 741 (1984). The Court also stated that the "statutory interpretation principles and legislative history discussed with respect to net worth are similarly apropos to the net income provision." *Ibid.*

[5] At that time, 1953, *N.J.S.A.* 54:10B–2(c)(5) provided:
   (c) "Net worth" shall mean:
   * * *
   (5) the amount of all indebtedness owing directly or indirectly to holders of ten per centum (10%) or more of the aggregate outstanding shares of the taxpayer's capital stock of all classes, as of the close of a tax year.

The Legislature eliminated subsection (5) by *L.*1975, *c.* 171, § 1, eff. Aug. 4, 1975. In 1993 it repealed the entire Financial Business Tax Law, *L.*1993, *c.* 295, § 1, eff. Jan. 1, 1994.

payer asserted that the banks and insurers were the real credi-
tors; hence, the parent acted as a mere conduit for receiving
credit from unaffiliated third-party sources. The Court rejected
the taxpayer's argument because the literal language of the statu-
tory definition of "net worth" compelled the result that the
indebtedness was owed directly to the parent from the subsidiary.
*General, supra,* 13 *N.J.* at 400–401, 99 *A.*2d 796.

In approving the holding in *General,* the Court in *Fedders*
stated:

> We affirmed that determination despite [taxpayer's] protestation that it had
> borrowed the monies from banks and insurance companies, which were the real
> creditors. The literal language of the statute compelled the result because the
> indebtedness was owed directly from the taxpayer to its parent.
>
> [*Fedders, supra,* 96 *N.J.* at 387, 476 *A.*2d 741.]

*Fedders* further noted that an indebtedness may arise when a
direct obligation comes into existence subsequent to the time the
original indebtedness was created. As an example, it cited *Inter-
state Storage and Pipeline Corp. v. Director, Div. of Taxation*
[1966–79 Transfer Binder] [N.J.] *St.Tax Rep.* (CCH) ¶ 200–708
(Div. of Tax Appeals, Dec. 2, 1976), where the taxpayer borrowed
funds from an unaffiliated third-party. Thereafter, another corpo-
ration (the parent) acquired taxpayer and its indebtedness. The
debt was held to be includible in calculating the taxpayer's net
worth because the taxpayer owed it directly to its corporate
parent. Commenting on this logic, the Court in *Fedders* noted:
"[i]nterestingly, the Division of Tax Appeals noted that if [the
parent corporation] had structured the transactions differently by
guaranteeing payment of the taxpayer's indebtedness rather than
becoming the obligee, the net worth would not have been in-
creased because the debt would not be owing to the taxpayer's
parent." *Fedders, supra,* 96 *N.J.* at 388–389, 476 *A.*2d 741. We
find this reasoning persuasive here.

The Court in *Fedders* continued that it was "crucial, then that
the direct debt be owed to the parent or controlling stockholders."
*Id.* at 389, 476 *A.*2d 741. Additionally, the Court posited that the
same principle applies when the taxpayer borrows funds from an

affiliated corporation, unless the monies are indirectly owed to the parent. The *Fedders* Court then provided examples of what constitutes direct and indirect debt and stated in pertinent part:

Assume A corporation owns B and C corporations, and the subsidiaries are engaged in their respective businesses. B has generated unneeded cash from its operations or has sold some of its securities to third persons (other than to the parent) and the proceeds are available for loans. B then advances some of that money to C. C's indebtedness is not owed to A directly or indirectly. If, however, A sold its securities and advanced funds to B, which in turn loaned dollars to C, then the indebtedness would be indirectly owed to A and under the statute should be included in the calculation of C's net worth [and net income]. There may be situations that are mixed. A may have made advances to B that had also obtained funds by borrowing from non-affiliated entities. C then borrows from B. In that event it would be presumed that C's indebtedness was indirectly owing to A. However, such a presumption should not be conclusive. If C establishes that A is not the source of the money, then the indebtedness would not be indirectly owing to the parent and hence would not be includible in C's net worth [and net income] calculation.

[*Fedders, supra,* 96 *N.J.* at 389, 476 *A.*2d 741.]

The Court added, "[w]hen it is not clear whether the indebtedness is indirectly owed to the parent, the taxpayer has the burden of demonstrating that the indebtedness is owed to third party creditors and not to the parent corporation." *Ibid.*

The Court in *Fedders* noted, moreover, that its statutory construction comported with the Act's legislative intent, stating:

[T]he legislative intent was to determine a corporation's net worth by including its real capitalization, whether reflected by its capital stock and surplus or by debt owing to its parent. Not any and all debt was to be included, but only that furnished directly or indirectly by the parent. In such cases, the debt would conceptually and realistically be part of the corporation's net worth.

[*Id.* at 391, 476 *A* 2d 741.]

*See also Fedders, supra,* 96 *N.J.* at 397–402, 476 *A.*2d 741 (Handler, J., dissenting) (Legislature intended to prevent a corporation from reducing its reported net worth and avoiding payment of a higher franchise tax by reflecting a contribution from a large stockholder, couched in the form of a loan, as a liability); *GATX Terminals, supra,* 5 *N.J.Tax* at 97 (Legislature promulgated Act to provide a more suitable tax base for corporations holding substantial assets but reporting little or no net worth); *Kingsley v. Hawthorne Fabrics, Inc.,* 41 *N.J.* 521, 525–526, 197 *A.*2d 673

(1964) (to effect a proportionately equal tax burden on all corporations, provision was made to include all indebtedness owing directly or indirectly to a ten percent stockholder because, in reality, such loans or extensions of credit usually are contributions to capital and hence should not be treated as liabilities in calculating net worth); *Werner Mach. Co. v. Zink,* 6 *N.J.Super.* 188, 193, 70 *A.*2d 774 (App.Div.1950) (Legislature intended to impose franchise tax upon all corporations doing business within State regardless of whether they operate on deficit financing or on equity capital basis). *See also Skyline Industries, Inc. v. Taxation Div. Director,* 3 *N.J.Tax* 612, 618 (Tax 1981) (the Act is not limited in its reach to forms of indebtedness representing disguised capital).

On the same day *Fedders* was decided, the Court also stated that "an indebtedness owed by the taxpayer to an affiliated corporation is presumed to be indirectly owed to the common parent, unless the affiliated corporation is shown to have been the conduit of funds from a non-affiliated source." *Mobay Chemical Corp. v. Director, Div. of Taxation,* 96 *N.J.* 407, 476 *A.*2d 758 (1984). In *Mobay,* the taxpayer overcame this presumption because it borrowed funds from an affiliated, non-parent, sister corporation, which itself had obtained funds from unaffiliated foreign investors. Although the common parent of these two subsidiaries unconditionally guaranteed the debt, the Court rejected the Director's argument that the taxpayer indirectly owed the monies to the common parent. Therefore, the taxpayer was able to exclude interest paid on this debt when calculating its net worth.

In their interpretation of the Act, *Fedders* and *Mobay* apply the well-settled rule that courts should apply a literal application of the statutory language when the Legislature has distinctly and unequivocally expressed its intent. *Toys "R" Us, Inc. v. Taxation Div. Director,* 8 *N.J.Tax* 51, 62 (Tax 1985). The "guiding principle is the plain, clear, unambiguous meaning of the law as gleaned from the written words of the statute." *Id.* at 63 (citing *State v.*

*Butler*, 89 *N.J.* 220, 445 *A.*2d 399 (1982)). In *Butler*, *supra*, our Supreme Court stated:

> As a general rule of statutory construction, we look first to the language of the statute. If the statute is clear and unambiguous on its face and admits of only one interpretation, we need delve no deeper than the act's literal terms to divine the Legislature's intent.
>
> [*Butler*, *supra*, 89 *N.J.* at 226, 445 *A.*2d 399.]

In addition, a court's function is not to rewrite legislation, and it should not attempt to do so simply because the legislation does not comport with the court's idea of how the statute should read. *Toys "R" Us*, *supra*, 8 *N.J.Tax* at 63. "Where the wording of a statute is clear and explicit [courts] are not permitted to indulge in any interpretation other than that called for by the express words set forth," *Duke Power Co. v. Patten*, 20 *N.J.* 42, 49, 118 *A.*2d 529 (1955) (citations omitted), and, indeed, "it is improper for a court to impose any interpretation or construction beyond the express meaning of the language in the law." *Toys "R" Us*, *supra*, 8 *N.J.Tax* at 63. *See In re Jamesburg High School Closing*, 83 *N.J.* 540, 547, 416 *A.*2d 896 (1980) (court should follow the clear import of statutory language); *Alling Street Urban Renewal Co. v. City of Newark*, 204 *N.J.Super.* 185, 189, 497 *A.*2d 1287 (App.Div.1985) (statutory construction is improper, and does violence to the separation of powers doctrine, when words used have plain meaning), *certif. denied*, 103 *N.J.* 472, 511 *A.*2d 653 (1986); *MacMillan v. Director, Division of Taxation*, 180 *N.J.Super.* 175, 177, 434 *A.*2d 620 (App.Div.1981) (court cannot permit liberal construction or, as a matter of fact, any construction if words of the statute plainly convey legislative intent), *aff'd*, 89 *N.J.* 216, 445 *A.*2d 397 (1982).

To implement the interpretation *Fedders* and *Mobay* afforded the statutory phrase "indebtedness owing directly or indirectly," the Director promulgated *N.J.A.C.* 18:7-4.5(d), (e), which provide:

> (d) Direct indebtedness: In the case of a creditor, corporate or otherwise (other than an individual), including an estate, trust or other entity, indebtedness is includible by reason of direct holding of taxpayer's stock by the creditor whether or not the creditor is functioning as a mere conduit of funds from a third party source.

(e) Indirect indebtedness: Indebtedness must be owing directly or indirectly to a 10 percent shareholder. Indebtedness owing by a taxpayer to a commonly controlled creditor is presumed to be owing indirectly to the common parent. However, indebtedness between commonly controlled debtors and creditors may not be attributable as owing indirectly to the common shareholder if it can be shown that the common shareholder was in no way the source of the funds. The taxpayer must establish that the common shareholder was not the source of the funds since it has the burden of defeating the presumption. The taxpayer must conclusively establish that:

1. The creditor is merely a conduit of funds from an unrelated third party source; or

2. The indebtedness was from funds generated by the creditor from its own operations and clearly not in any way attributable to or funded by the common shareholder.

Although *N.J.A.C.* 18:7–4.5(e) provides a conduit safe harbor for indebtedness owed *indirectly* by a taxpayer subsidiary to its corporate parent—assuming taxpayer bears its burden and defeats the aforementioned presumption—*N.J.A.C.* 18:7–4.5(d) expressly excludes such indebtedness when the parent is *directly* the creditor, even though the funds may derive from an unaffiliated third-party source. *See Toys "R" Us, supra,* 8 *N.J.Tax* at 61–62.

Of course, the issue here is not whether Rollins is subject to the CBT. The issue before us is whether Rollins owed its indebtedness (as evinced by the promissory notes), either directly or indirectly,[6] to its corporate parent, RTL. The parties stipulated that:

3. Rollins needed cash for its operations. RTL, as a publicly traded company, agreed to issue debentures in the public marketplace to raise the necessary cash....

4. Simultaneously with the issuance of the debentures, RTL transferred the funds to Rollins in exchange for Rollins' promissory notes ... payable to RTL....

■ It is clear from the record that the financing contemplated an immediate assignment of the loan agreement and note and, in the words of the parties' stipulation: "Payments on the Notes are

---

6 Indirect debt is actually not involved because it was expressly ruled out in the Tax Court's opinion and the debt would not be indirect debt under *Fedders, Mobay,* or the regulations quoted above. *See* discussion *supra,* (op. at pages 544, and 547–549, 653 *A.2d* at 1134, and 1135–1136).

made by Rollins directly to the trustee." Simply stated, based upon the unconditional assignment of the notes and loan agreements to Continental, Rollins no longer owed any debt to RTL, either directly or indirectly. Hence, it may exclude from its net income calculation the interest expense paid on the notes for the years in question.

Even if RTL remained secondarily liable to Continental as an endorser (see *N.J.S.A.* 12A:3–414 [7]), it would be only as a guarantor.[8] Likewise, the fact that RTL remained ultimately liable to the debenture holders under the March 21, 1983 collateral trust indenture and subsequent supplements thereto does not convert the payments made by Rollins to Continental, as trustee for the debenture holders, into payments made to RTL. The Tax Court judge erred in concluding that "the loan repayments must be treated as loan repayments by the subsidiary *to* its parent." 13 *N.J.Tax* at 370 (emphasis added). Rollins is not obligated under the debentures, although unaffiliated third parties (debenture purchasers) used RTL's bond rating to facilitate getting funds to Rollins. Nor would payment to Continental, as trustee, or even to debenture holders directly, be direct or indirect payments to RTL. Thus, *N.J.S.A.* 54:10A–4(k)(2)(E) by its terms does not require exclusion of Rollins' indebtedness to Continental.

---

[7] Although under the documents Delaware law applied, it is conceded that the Delaware and New Jersey Uniform Commercial Code (UCC) provisions are the same. Even if viewed as a restrictive endorsement (and Rollins' liability under the loan agreement and assignment are clear), this would not make Continental, as trustee, any less "a holder" under the UCC. See *N.J.S.A.* 12A:1–201(20); *Bryen v. Krassner*, 208 *N.J.Super.* 639, 641, 506 *A.2d* 803 (App.Div.1986). See also *N J.S.A.* 12A:3–206(1) ("No restrictive endorsement prevents further transfer or negotiations of the instrument."). The issue of the effect or consequences of such an endorsement is not relevant to the status of Rollins, Continental, or RTL.

[8] As noted in *Toys "R" Us, supra,* 8 *N.J.Tax* at 65, "A loan guarantee is a future potential liability that is triggered only when the principal debtor defaults on payment." See *Fedders, supra,* 96 *N.J.* at 391, 476 *A.2d* 741 (Guarantor does not become a creditor until default, when guarantee is triggered.). See also *N.J.S.A.* 12A:3–416(1); *Ligran, Inc. v. Medlawtel, Inc.,* 174 *N.J.Super.* 597, 601–602, 417 *A.2d* 100 (App.Div.1986).

Unlike *Stinnes Interoil, Inc. v. Director, Div. of Taxation,* 7 *N.J.Tax* 473, 478 (Tax 1985) (taxpayer, a wholly-owned subsidiary, made withdrawals and repayments to an account maintained by its parent corporation), *aff'd o.b.,* 8 *N.J.Tax* 336 (App.Div.1986), and *Toys "R" Us, supra,* 8 *N.J.Tax* at 64–65 (taxpayer, a wholly-owned subsidiary, borrowed funds from an intercompany account maintained by its corporate parent), the instant appeal does not involve indebtedness directly owed by Rollins to its corporate parent, RTL. Nor did Rollins indirectly owe RTL, which acted merely as a conduit for funds received from Continental, an unrelated third-party source. Thus, Rollins did not have to include its interest expense in net worth because the statute clearly and explicitly directs only inclusion of amounts owed directly or indirectly to a ten percent stockholder.

Although Rollins borrowed the funds from RTL, and even owed those funds to it for a moment, the indebtedness ceased to be directly owed to RTL before any payments were due or made. Moreover, since unaffiliated debt can become affiliated debt, with resultant tax consequences, *see Fedders, supra,* 96 *N.J.* at 388–389, 476 *A.2d* 741, no reason exists not to conclude that the converse is also true, *i.e.,* if affiliated debt becomes unaffiliated debt that may inure to the taxpayer's tax benefit.

In summary, by virtue of RTL's assignment and negotiation of the promissory notes and the loan guarantees, Rollins no longer directly owed RTL during the tax years in issue, but, instead, was directly obligated to Continental. In the event of default, only Continental possessed the right to enforce the notes, not RTL, which had relinquished its right, title, and interest in the notes. In other words, Continental had the sole right to seek a remedy against Rollins in the event of nonpayment of the notes.

Reversed and remanded for recalculation of Rollins' CBT tax for the involved years consistent herewith.